Present: Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ., and Carrico and Koontz, S.JJ.

GEOFFREY SANDERS

                                        OPINION BY
v. Record No. 101870    SENIOR JUSTICE LAWRENCE L. KOONTZ, JR.
                                        June 9, 2011
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this case, the Circuit Court of the City of Portsmouth allowed the Commonwealth's medical expert to rely on the results of a laboratory report as the basis of her opinion that the victim of acts of sexual abuse had a sexually transmitted infection. The sole issue we consider is whether the Court of Appeals erred in holding that this portion of the expert's testimony did not violate the defendant's right to confront witnesses against him as guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution.

BACKGROUND

On June 12, 2008, allegations that Geoffrey Sanders had sexually abused his daughter "CL," who was under the age of thirteen, first came to light when CL reported the abuse to her mother. An ensuing investigation resulted in Sanders being indicted on May 7, 2009 for three counts of forcible sodomy, four counts of rape, four counts of object sexual

penetration, and two counts of taking indecent liberties with a child.

Prior to trial, Sanders filed a motion in limine requesting the circuit court to "order that the Commonwealth's witnesses refrain from stating that [CL] ever had a sexually transmitted disease and that she got the STD from the defendant."  On November 24, 2009, the court held a hearing on the motion in limine.  Expanding on the request of the motion, Sanders sought to exclude alleged hearsay statements contained in a laboratory report showing that CL had contracted chlamydia, a sexually transmitted infection.

At the hearing, Dr. Michelle Clayton, "a child abuse pediatrician at the Child Abuse Program at the Children's Hospital of The King's Daughters in Norfolk" (hereafter "the clinic"), testified that she examined CL on July 9, 2008.  As part of the examination, Dr. Clayton obtained a urine sample and vaginal swabs from CL.  According to Dr. Clayton, the "samples were obtained for testing of sexual transmitted infections."

Dr. Clayton sent the samples to the hospital's main laboratory, which then sent them for testing to Quest Diagnostics, an independent laboratory in California.  The Commonwealth introduced into evidence a printout of the hospital's electronic medical records showing the results of

that testing, which had been received from the independent laboratory.  Dr. Clayton did not know the name of the laboratory technician who tested the samples nor did she test the samples herself.  Instead, "[u]sing well-established procedures," she relied on the transmission of the results from the laboratory to determine "whether the tests were positive or negative."

In this instance, tests were done for chlamydia and gonorrhea.  Based on the test results and the physical examination, Dr. Clayton diagnosed CL with chlamydia.  When asked whether CL showed any visible signs of chlamydia, Dr. Clayton responded that CL had some vaginal discharge, but that vaginal discharge is present in a variety of conditions and is not necessarily a specific symptom of chlamydia.  However, Dr. Clayton noted that "when a child, that I'm examining, has vaginal discharge, I always obtain samples of it and send it for testing."

Follow-up testing on July 22, 2008 confirmed Dr. Clayton's diagnosis.  Additional testimony established that the test for chlamydia is a diagnostic test used to determine whether a "medical condition" exists.  The test determines whether the individual has the infection, but that, unlike a DNA test, the test does not provide information identifying the source of the infection.

Following this testimony, Sanders contended that Dr. Clayton's testimony was based on inadmissible hearsay. Sanders maintained that, by allowing Dr. Clayton to rely on the results of the laboratory report as the basis for her diagnosis, the Commonwealth was attempting to elicit testimony from an unknown laboratory technician. Relying upon Melendez-Diaz v. Massachusetts, 557 U.S. ___, 129 S.Ct. 2527 (2009), Sanders argued that the admission of testimony concerning the results of the laboratory test into evidence violated his Sixth Amendment right to confront and cross-examine witnesses.

The Commonwealth conceded that Dr. Clayton's opinion was based on hearsay. The Commonwealth contended, however, that "the doctor, by the rules of evidence, is allowed to render an opinion as to a diagnosis that she made for the purposes of medical treatment as to a condition." The Commonwealth further contended that Dr. Clayton was entitled to rely "on the history given, the physical exam she did, and the test that she ordered" in expressing her opinion as to a diagnosis. Consequently, the Commonwealth maintained that, "once qualified as an expert," Dr. Clayton would be entitled to testify that CL had contracted chlamydia based upon the results of the laboratory test.

The circuit court agreed that the "lab report itself under Melendez[-Diaz] is probably not admissible" and thus

4

sustained Sanders' motion with respect to the admissibility of the laboratory report.  However, the court further ruled that it would allow "Dr. Clayton as an expert witness . . . to rely upon the lab report as part of her diagnosis in the case." [1]

---

[1] The Commonwealth's contention that Dr. Clayton could testify that she "diagnosed" CL as having contracted chlamydia based on the results of the laboratory test, and the circuit court's subsequent ruling that she would be allowed to "rely upon the lab report as part of her diagnosis" even though the report was "probably" inadmissible hearsay, does not correctly reflect the law regarding expert witness testimony in criminal prosecutions in Virginia.  In Simpson v. Commonwealth, 227 Va. 557, 566, 318 S.E.2d 386, 391 (1984), we noted that Code § 8.01-401.1, which permits "an expert to base his opinion on facts made known or perceived by him at or before trial, whether admissible in themselves or not, provided they are facts of a type normally relied on by other experts in the field," is limited by the express language of the statute to civil cases.  In Simpson, we declined the Commonwealth's invitation to judicially expand this rule to criminal prosecutions.  Id.; see also Wright v. Commonwealth, 245 Va. 177, 197, 427 S.E.2d 379, 392 (1993); Buchanan v. Commonwealth, 238 Va. 389, 416, 384 S.E.2d 757, 773 (1989); Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 17-18(e) (6th ed. 2003 & Supp. 2010-11).

In this instance, it is clear that Dr. Clayton's testimony concerning her "diagnosis" that CL had contracted chlamydia was based solely on the lab report, not upon any independent observation or analysis made by her and, thus, if the lab report was not to be admitted at trial, her testimony on this point would lack a proper foundation.  Cf. Simpson, 227 Va. at 566, 318 S.E.2d at 391-92 (holding that an expert's testimony "[b]ased entirely upon his personal observations" and records admitted into evidence was properly admitted).  However, Sanders has not asserted that Dr. Clayton's trial testimony lacked a proper foundation.  Rather, both at trial and on appeal, he has limited his argument to whether Dr. Clayton's testimony concerning the content of the lab report violated his right to confront and cross-examine the technician who prepared the report.  Accordingly, the issue of whether Dr. Clayton's trial testimony on this point lacked an adequate foundation is not before us, and we will not address

5

A jury trial was held on the indictments against Sanders beginning on December 21, 2009.  The Commonwealth's case against Sanders consisted chiefly of the following evidence: CL's testimony concerning her father's assaults on her, a suicide attempt by Sanders after CL's allegations against him were made, and evidence that both Sanders and CL had contracted chlamydia.  As relevant to our resolution of this appeal, we necessarily will focus our analysis on this third element of the evidence.

At trial, Dr. Clayton testified as an expert in the field of child abuse pediatrics.  As a child abuse pediatrician, Dr. Clayton stated that her duties are "multifaceted."  She explained that whenever "there is a suspicion of child abuse, including physical abuse, sexual abuse or neglect," child abuse pediatricians are "called to complete an assessment and give an opinion regarding the likelihood of abuse or neglect" or interpret their "examination findings."

Regarding her medical examination of CL on July 9, 2008, Dr. Clayton testified that CL was referred to the clinic "by an investigative agency because of an allegation or disclosure of sexual abuse."  Dr. Clayton "only performed a medical

it further.  Moreover, we are of opinion that our resolution of the confrontation issue will moot the question of whether admission of the testimony was proper.

6

evaluation of [CL]."  Dr. Clayton did not discuss with CL what happened to her, as the clinic has specialists such as forensic interviewers who interview the children.  However, based on information from CL's "mother and the police," Dr. Clayton understood that she was examining CL for signs of sexual abuse and vaginal penetration.

Dr. Clayton testified that the medical exam she performs is much like a regular gynecological exam.  The major differences are that the clinic's examinations are recorded on video and are limited to the outside of the child's genital area.

Aside from "a moderate vaginal discharge," Dr. Clayton noted that "[e]verything looked perfectly normal and healthy" with CL's examination.  Dr. Clayton also noted that the "vast majority of children who have made an allegation or disclosure of sexual abuse have a normal examination" and that "often there is no physical sign of that injury once you're more than a few days out from the . . . alleged event."

Dr. Clayton further testified that the clinic orders a variety of laboratory studies when there is a concern of sexual abuse.  For instance, for children already in puberty like CL, the clinic takes "a urine pregnancy test just to insure there's no pregnancy."  That urine is also tested for gonorrhea and chlamydia.  Dr. Clayton obtained swabs of the

7

vaginal discharge that she noticed during CL's exam and sent the swabs for laboratory testing of gonorrhea and chlamydia as well. Dr. Clayton knew the samples of the vaginal discharge were sent to a laboratory in California, but did not know precisely how the test was conducted. When asked about her diagnosis, Dr. Clayton responded, "I diagnosed [CL] with Chlamydia on the basis of the test results that were performed on July 9th, 2008."[2]

Tonya Gardner, a child protective service worker with the Portsmouth Department of Social Services, testified that she met with Sanders on July 21, 2008 to interview him regarding the allegations of sexual abuse made by his daughter. During this interview, Sanders spontaneously told Gardner that he had chlamydia.

During closing argument, the Commonwealth asserted that the jury could convict Sanders based solely on CL's testimony, but they did not have to because there was more than just the testimony of the victim in this case. The Commonwealth stated:

> [Sanders] gave [CL] chlamydia. You have [heard]
> that from Dr. Clayton and Tonya Gardner. It's clear
> that the defendant had it. He admitted to it.

---

[2] Chlamydia is a treatable sexually transmitted infection. On July 22, 2008, Dr. Clayton had CL return to the clinic to receive a prescription to treat the infection. When CL returned to the clinic again on September 17, 2008, it was determined that the infection had been cured.

8

Unprompted, he told Tonya Gardner that he had chlamydia.  And we know from Dr. Clayton that [CL] had it.

The jury returned its verdicts convicting Sanders of two counts of forcible sodomy, three counts of rape, four counts of object sexual penetration, and two counts of taking indecent liberties with a child.  Following the preparation of a presentence report, the circuit court sentenced Sanders in accord with the jury verdicts to multiple sentences of life imprisonment on the forcible sodomy, object sexual penetration, and rape charges, and five years imprisonment on the indecent liberties charges.

The Court of Appeals denied Sanders' petition for appeal by an unpublished per curiam order, finding that the "laboratory report which [Dr.] Clayton obtained in the course of her continued medical treatment of the victim was not 'testimonial' for purposes of Sixth Amendment confrontation." Sanders v. Commonwealth, Record No. 0374-10-1, slip op. at 2 (September 1, 2010).  We awarded Sanders this appeal.

                          DISCUSSION

Sanders contends that allowing Dr. Clayton to state the conclusion of the unknown laboratory technician as expressed in the laboratory report indicating the CL had contracted chlamydia violated his right to confront and cross-examine

9

witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution. In Sanders' view, Dr. Clayton did not express her opinion that CL had chlamydia. Rather, she merely read into evidence the laboratory test results. Sanders asserts that the test results are like the certificates of analysis found inadmissible in Melendez-Diaz in that they are clearly "testimonial" and not admissible at trial unless the defendant is afforded an opportunity to cross-examine the declarant, or had an opportunity on a previous occasion to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 51 (2004).

As evidence of the testimonial character of the test results, Sanders submits that CL was referred to Dr. Clayton, a "child abuse pediatrician," "because of an allegation or disclosure of sexual abuse," and that Dr. Clayton received the information about this alleged sexual abuse from CL's "mother and the police," not CL. Under these circumstances, Sanders maintains that his rights under the Confrontation Clause were violated because an objective person could reasonably expect that the test results provided to Dr. Clayton would be used in a later criminal prosecution. Melendez-Diaz, 557 U.S. at ___, 129 S.Ct. at 2537-39; Davis v. Washington, 547 U.S. 813, 822 (2006).

The Commonwealth responds that the evidence in question was not testimonial.  The Commonwealth submits that the Supreme Court in Melendez-Diaz expressly noted that "medical reports created for treatment purposes" are not testimonial. 557 U.S. at ___, 129 S.Ct. at 2533 n.2.  The Commonwealth contends that the evidence in this case reflects that the "primary purpose" of the laboratory test was medical treatment, rather than "to prove past events potentially relevant to later criminal prosecutions."  Davis, 547 U.S. at 833.  The Commonwealth therefore maintains that there was no violation of Sanders' Sixth Amendment right to confrontation.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In Crawford, the Supreme Court limited the application of the Confrontation Clause to testimonial statements.  541 U.S. at 68.  The Court stated, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  Id. at 68-69.  Consequently, the Court held that the Confrontation Clause does not allow the admission of testimonial statements of a witness who did not testify at trial "unless [the witness] was unavailable to testify, and

11

the defendant had had a prior opportunity for cross-examination."  Id. at 53-54.

The Supreme Court did not comprehensively define "testimonial" but offered suggestions as to its meaning.  The Court described the "core class of testimonial statements" as follows:

> ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;] extrajudicial statements . . . contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions[;] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Id. at 51-52 (citations and internal quotation marks omitted). We likewise have acknowledged there are different classes of testimonial statements in Walker v. Commonwealth, 281 Va. 227, 231, 704 S.E.2d 124, 126 (2011).  See also Crawford v. Commonwealth, 281 Va. 84, 99-100, 704 S.E.2d 107, 116-17 (2011).

In Davis, the Supreme Court provided guidance on what constitutes a testimonial statement when made during the course of a police interrogation.  There, the Court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of

12

the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. Although this definition focused on the "primary purpose of the interrogation," the Court emphasized that statements made in the absence of interrogation were not necessarily nontestimonial: "[I]t is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." Id. at 822-23 n.1.

In Melendez-Diaz, the Court considered whether certificates of analysis reporting the results of forensic tests were testimonial, "rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." 557 U.S. at ___, 129 S.Ct. at 2530. At trial, the prosecution introduced three certificates of analysis establishing that substances seized by the police contained cocaine. Id. at ___, 129 S.Ct. at 2531. The certificates were sworn by the forensic analysts before a notary public as required by Massachusetts law. Id. The defendant objected to the admission of the certificates, asserting that Crawford required the analysts to testify in person. Id.

13

Relying on the "core class of testimonial statements" adverted to in Crawford, the Court concluded that the certificates were "quite plainly affidavits." Id. at ___, 129 S.Ct. at 2532. The Court explained that the certificates were "functionally identical to live, in court testimony, doing 'precisely what a witness does on direct examination.' " Id. (quoting Davis, 547 U.S. at 830). The Court further explained:

> [N]ot only were the affidavits made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, but under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance. We can safely assume that the analysts were aware of the affidavits' evidentiary purpose.

Id. (citations and internal quotation marks omitted). The Court therefore held that the "analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." Id. Absent a showing that the analysts were unavailable to testify at trial and that the defendant had had a prior opportunity to cross-examine them, the defendant was "entitled to 'be confronted with' the analysts at trial." Id. (quoting Crawford, 541 U.S. at 54).

With these principles in mind, we turn to our analysis of the issue in this case. Before doing so, we note that this

14

case differs from Melendez-Diaz in that the laboratory report in question was never admitted into evidence at trial.  The circuit court ruled that the laboratory report itself was inadmissible, but that Dr. Clayton could "rely upon the lab report as part of her diagnosis."  In Melendez-Diaz, the Supreme Court noted that "medical reports created for treatment purposes" are nontestimonial.  557 U.S. at ___, 129 S.Ct. at 2533 n.2.  This is so because statements made for medical treatment purposes are not made in anticipation of or for use in an investigation or prosecution of a crime.  Therefore, the focus of our analysis in this case is whether the laboratory report as referenced in Dr. Clayton's testimony was created for medical treatment purposes or forensic investigation purposes.

A recent decision by the United States Court of Appeals for the Fourth Circuit addressed whether the testimony of two expert witnesses who based their opinions in part on testimonial statements from unidentified declarants violated the defendant's Sixth Amendment right to confrontation. United States v. Johnson, 587 F.3d 625 (4th Cir. 2009). There, the court reasoned:

> Crawford forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments

15

were in some part informed by their exposure to otherwise inadmissible evidence.

> An expert witness's reliance on evidence that Crawford would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot out-of-court testimonial statements . . . to the jury in the guise of expert opinion would provide an end run around Crawford. For this reason, an expert's use of testimonial hearsay is a matter of degree. The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem. The expert's opinion will be an original product that can be tested through cross-examination.

587 F.3d at 635 (citations and internal quotation marks omitted).

Beyond question, there is a forensic aspect to Dr. Clayton's duties as a child abuse pediatrician. Part of her duties include "complet[ing] an assessment [of the victim] and giv[ing] an opinion regarding the likelihood of [sexual] abuse." This involves working with law enforcement and other investigative agencies such as the Department of Social Services. In this case, CL was referred to Dr. Clayton from an investigative agency. Dr. Clayton received information about the sexual abuse allegations from CL's "mother and the police." Dr. Clayton also understood that she was examining

16

CL for signs of sexual abuse and vaginal penetration. Finally, clearly unlike the situation when a female patient is examined during a regular gynecological exam, the clinic's exams are recorded on video, which suggests that these videos could be turned over to the Commonwealth for prosecutorial purposes.

Nevertheless, Dr. Clayton also provided medical diagnosis and treatment to CL. In fact, Dr. Clayton "only performed a medical evaluation of [CL]," as the clinic has specialists such as forensic interviewers who interview the children about what happened to them. Certainly, an aspect of examining a child for signs of sexual abuse involves diagnosing and, when indicated, treating the patient for injury and sexually transmitted infections. Here, Dr. Clayton after observing a vaginal discharge sent CL's urine and vaginal swabs for routine testing of sexually transmitted infections. There is no evidence that law enforcement requested this testing. There is also no evidence that Dr. Clayton knew that Sanders had chlamydia, as that fact was not disclosed to investigators until after Dr. Clayton's examination of CL. Furthermore, the test for chlamydia is a diagnostic test to determine if a "medical condition" exists, and that unlike a DNA test, it does not provide information regarding the source of the infection. Lastly, when the testing results came back

positive for chlamydia, Dr. Sanders actually treated CL and cured the infection.

Under these circumstances, Dr. Clayton's medical examination of CL served a dual purpose: (1) to gather forensic information to investigate and potentially prosecute a defendant for the alleged offenses and (2) to obtain information necessary for medical diagnosis and treatment of the victim. The laboratory report was for medical treatment purposes as it was created to permit Dr. Clayton to medically diagnose and treat CL for sexually transmitted infections. Because reports created for medical treatment purposes are nontestimonial, Sanders' Sixth Amendment right to confront witnesses against him was not violated.

The fact that the Commonwealth sought to use the laboratory report in a criminal prosecution does not change its nontestimonial character. In order to determine if a statement is testimonial, the statement must be evaluated as to whether the statement was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 52.

Unlike Melendez-Diaz, where the forensic analysts understood that their reports would be used prosecutorially, there is no evidence here that the laboratory technicians that

18

tested CL's samples understood that the report would be used to prosecute Sanders for a crime. The victim's medical condition must be considered, and "[i]n determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances." Michigan v. Bryant, ___ U.S. ___, 131 S.Ct. 1143, 1161-62 (2011). Thus, "objectively evaluat[ing] the circumstances," there is no basis presented in this record for concluding that the "primary purpose" of eliciting the report would reasonably have been understood by the laboratory technicians in California to be the development of a statement for use at trial. See id. at ___, 131 S.Ct. 1154-57 (the "medical condition of the victim" is a prominent consideration in determining primary purpose); see also id. at ___, 131 S.Ct. at 1157 (reiterating that statements for medical treatment are "by their nature, made for a purpose other than use in a prosecution"). The Supreme Court has stated that when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose" of the statement "by objectively evaluating the statements and actions of the parties to the encounter." Id. at ___, 131 S.Ct. at 1162.

The record in the present case only reflects that the independent laboratory performed the testing after receiving

the samples from the clinic.  Furthermore, unlike a crime laboratory testing for narcotics or DNA, there are any number of typically non-prosecutorial reasons to test urine and vaginal discharge, such as for infections arising from both consensual sexual and nonsexual exposure to pathogens.  Thus, under these circumstances, a laboratory technician would not have reason to believe or suspect that the results of his or her testing would be used in a later trial.  Accordingly, we conclude that the lab report, and by extension Dr. Clayton's testimony as to its content, were not subject to exclusion under Melendez-Diaz.  Compare Cypress v. Commonwealth, 280 Va. 305, 309-16, 699 S.E.2d 206, 208-11 (2010) (certificates of analysis admitted into evidence "establishing" that the substances seized were illegal narcotics, and stating the weight of the samples, were "testimonial"), with Aguilar v. Commonwealth, 280 Va. 322, 333-35, 699 S.E.2d 215, 220-22 (2010) (the admitted material was from the live witness, who did not recount the "declaration[s]" or "affirmation[s]" of other personnel who performed functions in the analysis of samples, and "nothing from [the other professional] was presented to the fact-finder in a form 'functionally identical to live, in-court testimony,' doing 'precisely what a witness does on direct examination' ").

CONCLUSION

For these reasons, we hold that there is no error in the judgment of the Court of Appeals that the laboratory report in question was not testimonial for purposes of Sixth Amendment confrontation.  Accordingly, we will affirm Sanders' convictions.

<u>Affirmed.</u>