UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges AtLee and Athey
Argued by videoconference

JOURNY LEE SNEAD

MEMORANDUM OPINION* BY
v.        Record No. 1211-19-2          JUDGE RICHARD Y. ATLEE, JR.
                                        FEBRUARY 2, 2021

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Kimberley S. White, Judge

John E. Greenbacker, Jr. (John Hall Francis Greenbacker, on
brief), for appellant.

Rachel L. Yates, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Following a jury trial, the circuit court found appellant Journy Lee Snead guilty of

first-degree murder and child endangerment.  Snead received a sentence of twenty years in

prison for murder and two years for child endangerment.  On appeal, Snead argues that:  (1) the

circuit court erred in finding a child witness, J.L.S.,[1] competent to testify; (2) the proceedings

violated his due process and Confrontation Clause rights; and (3) the circuit court erred in

admitting J.L.S.'s prior statements.  For the following reasons, we affirm.

I. BACKGROUND

"On appeal of criminal convictions, we view the facts in the light most favorable to the

Commonwealth, and [we] draw all reasonable inferences from those facts."  Payne v.

Commonwealth, 65 Va. App. 194, 198 (2015).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We refer to the child witness by her initials in the interest of protecting her privacy.

Snead was charged with the murder of his grandfather, J.L.S.'s great-grandfather (whom she called "Poppa"), Floyd Leslie Crider.  The murder took place on July 18, 2018.  Floyd Crider died from blunt force trauma to the head.  J.L.S. was three years old at the time of the incident and was a witness to the murder,[2] giving rise to the child endangerment charge.

A.  *Pre-trial Motion*

Via pre-trial motion, the Commonwealth sought to introduce statements J.L.S. made separately to a forensic interviewer and to John Lester, a pastor who served as J.L.S.'s foster parent after the murder.

During the hearing on the motion, the circuit court saw a video of a forensic interview conducted by Jessica Potter with J.L.S. on November 20, 2018.  In it, J.L.S. told the interviewer that she saw "Daddy hit Poppa with a stick . . . he was hit in the head, that he fell on the ground, that he died and went to heaven, that he melted."  She said it was "red" when the decedent "melted," and she used the word "bleed."  In the same interview, J.L.S. said she saw "Daddy swing at Poppa and Poppa had a broom."

Two professionals who had worked with J.L.S. testified at the hearing.  The first, Teresa Duffey, was a behavioral health consultant who had provided play therapy to J.L.S.  She testified that J.L.S. was "very bright" and, having observed her emotional and psychological development, found J.L.S. was functioning "definitely on a four-year-old level."

The second witness, Ian Danielson, was certified as an expert in the field of child development and forensic interviewing.  He had assessed J.L.S., and he found she was "highly competent on the majority of items, impressive."  She knew the difference between the truth and

---

[2] Under Snead's theory of innocence, J.L.S. was not a witness to the murder; however, "we view the evidence in the light most favorable to the Commonwealth."  Payne, 65 Va. App. at 198.

lying. She demonstrated good recall and was "engageable" and "cooperative with adults." He found she was "well along developmentally in both communication and language and certainly social, emotional, cognitive development." She observed things accurately and demonstrated good recall. She "introduces topics on her own initiative," and was willing to say "I don't know," lending her credibility because "she doesn't feel compelled to try and guess to please an adult." He noted that J.L.S. even corrected the forensic interviewer about whether something was a mop or a broom, suggesting "she's not trying to acquiesce to the grown-up to please them or come up with the right answer."

Lester, a senior pastor who cared for J.L.S. as a foster parent, testified at the hearing as well. He knew no details of the murder, only that the placement agency explained, when dropping J.L.S. off, "that she could start talking to [him] about a murder, that they weren't sure" but alerted him so no one would be "alarmed if anything came up." He testified that one evening after a bath, J.L.S. asked if she could tell him a story. She said she had been watching television in another room when she heard a "bang." She came out of the room, and she saw her Poppa on the floor with "blood all over his head." She said, "daddy tried to load something heavy into the car but couldn't get it in there so brought it back in." She told Lester that Snead got her and drove off and that he told her that "somebody had broke[n] into the house." Lester had no knowledge of or connection to either Snead or the Crider family.

The Commonwealth proffered testimony from a jailhouse informant (Johnny Owen Clay, who would later testify at trial) "indicat[ing] that there was apparently another safe in the house per the defendant that [was] removed from the house and that law enforcement wasn't aware of," noting that this corroborated J.L.S.'s statement about Snead loading something heavy into a car, and his telling her that someone had broken in.

Christine Crider, J.L.S.'s great-aunt[3] "Nini," also testified.[4] She is married to Snead's uncle, and they reside in a home next door to the other Crider residence where the murder occurred. Christine explained that on November 17, 2018, J.L.S. spent the night with her. J.L.S. had been on the phone with her great-grandmother, Gloria "Meme" Crider,[5] who had invited J.L.S. to go on a trip with her, J.L.S.'s mother, and the defendant. J.L.S. said that she did not want to go and wanted to stay with "Nini." J.L.S. then asked if she could tell "Nini" a secret. J.L.S. said "my daddy and Poppa were arguing and Daddy hit Poppa in the head with a stick that hit a ball." Christine's husband called the police to report the statement. This is what prompted the forensic interview with J.L.S. Christine explained that later, when Snead was supposed to pick J.L.S. up, J.L.S. did not want to go with her father, crying that she wanted to stay with "Nini."

The circuit court reviewed the factors set forth in Code § 19.2-268.3(B)(1)[6] in detail and concluded that they weighed in favor of admitting J.L.S.'s statements. Code

---

[3] Snead's family tree gets a bit convoluted at points. For example, the record conflicts at points as to whether Christine was J.L.S.'s aunt or great-aunt, but the evidence suggests that she is her great-aunt.

[4] Because there are numerous "Criders" associated with this case, we refer to Christine and Gloria by their first names.

[5] As with "Nini," the record frequently refers to "Meme" as J.L.S.'s grandmother, when it appears she is her great-grandmother, and the deceased's wife.

[6] Under Code § 19.2-268.3(B),

> An out-of-court statement made by a child who is under 13 years of age at the time of trial or hearing who is the alleged victim of an offense against children describing any act directed against the child relating to such alleged offense shall not be excluded as hearsay under Rule 2:802 of the Rules of Supreme Court of Virginia if both of the following apply:

§ 19.2-268.3(B)(1)(a) was satisfied, presuming for the time being that J.L.S.'s testimony was about her personal knowledge. Considering subsection (b), the circuit court relied upon the Commonwealth's witnesses' testimony in finding that J.L.S. was appropriately mature, "highly competent," had good verbal skills, and was "impressive." It found that J.L.S. knew the difference between the truth and lies and could distinguish between "make believe and real." The circuit court also noted that J.L.S.'s emotions were consistent with and reflected her statements, further indicating that she was not simply repeating something someone told her to say. The circuit court found that her ability to remember things throughout the course of the interview demonstrated that she had good recall.

The circuit court then found that the statements met the requirements of Code § 19.2-268.3(B)(1)(c) — that the person testifying about the statement be credible. It noted that Potter was a professional and that there was no reason why Lester would not tell the truth. The circuit court found that Potter did not appear to prompt J.L.S. to give certain answers in the interview. The circuit court likewise found that the timing of J.L.S.'s statement to Christine Crider confirmed its credibility: "If this statement had been made up it would have been told

---

1. The court finds, in a hearing conducted prior to a trial, that the time, content, and totality of circumstances surrounding the statement provide sufficient indicia of reliability so as to render it inherently trustworthy. In determining such trustworthiness, the court may consider, among other things, the following factors:

   a. The child's personal knowledge of the event;
   b. The age, maturity, and mental state of the child;
   c. The credibility of the person testifying about the statement;
   d. Any apparent motive the child may have to falsify or distort the event, including bias or coercion;
   e. Whether the child was suffering pain or distress when making the statement; and
   f. Whether extrinsic evidence exists to show the defendant's opportunity to commit the act . . . .

earlier on, not in November after — after Mr. Crider died in July." The circuit court held that any inconsistencies could be addressed through argument at trial.

Addressing subsections (d) and (e), the circuit court found no motive to falsify or distort the event, no "bias or coercion on the part of" J.L.S, and no detectable pain and distress. Finally, the circuit court noted that, under subsection (f), there was extrinsic evidence to show Snead had the opportunity to commit the crime.

Having gone through each factor, the circuit court found that the requirements of Code § 19.2-268.3(B)(1) were satisfied and that the statute would apply, so J.L.S.'s statements would be admissible contingent on her testifying at trial or being found "unavailable" as required under subsection (2). Code § 19.2-268.3(B)(2) (requiring that the child also "testif[y]" or be "declared by the court to be unavailable as a witness"). The circuit court elected to hold the competency hearing for J.L.S. on the day of trial.

## B. *Trial*[7]

The circuit court first addressed J.L.S.'s competency to testify. The Commonwealth asked J.L.S. to identify the color of counsel's tie, and she correctly answered "purple." She said it would be a lie if someone said it were blue. When asked if it is "okay to tell lies," she responded "[n]o!" She promised that she would tell the truth. After talking about playing dress-up and pretend, she promised she wouldn't "talk about anything that's pretend" and would "only talk about real things."

The circuit court incorporated the testimony heard at the pre-trial hearing. Referring to the expert testimony, it found J.L.S. was an "exceedingly bright child" who knew the difference

---

[7] A number of individuals testified at trial, but their testimony is not directly pertinent to the questions at issue on appeal. As such, we do not detail that testimony in this memorandum opinion.

between "pretend and make-believe and real." J.L.S. "demonstrated an ability to know what the truth was and what a lie was." It determined that J.L.S. appeared to be "ready, willing, and able to answer questions." It incorporated the evidence from the forensic interview based in part upon the forensic interview "only inasmuch as it demonstrates her ability to recall." For these reasons, it concluded J.L.S. was competent to testify.

When J.L.S. was called to testify (via closed-circuit[8]), she did not testify as the prosecution anticipated. The Commonwealth asked her to tell the circuit court "about your Poppa." She said "he just got dead." She said she was not there when that happened and that she was at the store. She said she did not know how he "got dead." The Commonwealth asked J.L.S. if someone told her what to say about how he "got dead," and she said "Nini." The prosecutor responded "Nini? What did she say to say?" and J.L.S. looked toward Christine Crider and said, "Did you say it, Nini?" The prosecutor asked J.L.S. to look back at him and asked "who told you he got dead while you were at the store?" to which J.L.S. replied "I don't know."

The Commonwealth redirected J.L.S.'s attention to a photo of herself, her mother, and Snead. J.L.S. said her "Poppa" was "in heaven." The prosecutor asked, "when you said Poppa got dead while you were at the store is that real or not real?" J.L.S. first responded "yes," and when asked again said "I promise" and nodded. Defense counsel noted that J.L.S. had been told to respond with "yes" or "no" answers. When asked "do you know where your daddy got dead," J.L.S. corrected the prosecutor, saying "My daddy didn't; my [P]oppa." When asked if her "[P]oppa" was "hurt" when he "got dead," she responded "I don't know. I don't know because I didn't — I wasn't there. I was at the store, remember?" Finally, when asked "[d]id anyone tell

---

[8] She was accompanied in a separate conference room in the courthouse by Christine "Nini" Crider, her great-aunt.

you to say that you were at the store?" J.L.S. responded, "Uh-huh; my daddy and Meme." The defense asked only if J.L.S. loved her father, and she said she did.

The circuit court called the forensic interviewer, Potter, who testified after the court viewed the tape of the interview with J.L.S. After she was qualified as an expert, the defense renewed its objections "regarding the admissibility of various statements" that the circuit court previously deemed admissible, arguing that Code § 19.2-268.3 "wipes out the right of confrontation under the constitution." The circuit court, having now heard J.L.S. testify, found that she didn't have any personal knowledge of the event, a factor in admitting her prior statements under Code § 19.2-268.3(B)(1)(a). It therefore decided to reverse its ruling that the prior statements were admissible but indicated it would revisit the issue "if there's something that makes them inherently trustworthy in light of the completely contradictory statement of the witness."

Ian Danielson, an expert who testified at the pre-trial hearing, took the stand outside the presence of the jury to assist with addressing the "trustworthiness" of J.L.S.'s prior statements. The circuit court adopted his testimony from the prior hearing. When asked what could be the cause of "the dramatic contradiction" between J.L.S.'s testimony versus her prior statements, Danielson offered several possibilities. First, a "considerable amount of time" had passed since the murder, particularly in the life of a young child, and "over time children can remember things somewhat differently." It also could be a "trauma rooted response" because a child could repress a traumatic memory which is "too painful" for the child to recall or share. In these circumstances, the testimony is not a "lie" because the child was not trying to deceive.

Danielson went on to evaluate factors that spoke to the veracity of J.L.S.'s statements in the forensic interview, including the fact that she, on her own initiative, corrected the interviewer, and was willing to answer "I don't know" instead of making up an answer.

- 8 -

Furthermore, the interview took place in an environment designed "with the child's developmental needs in mind," in "a home type environment" "presumably where the child felt safe and comfortable." Moreover, only the interviewer would have been present, asking questions designed not to contaminate the child's memories. Acknowledging that the circuit court had tried to be accommodating to the child's needs, Danielson contrasted that interview setting with the courthouse, noting that it was not particularly "child friendly" and that there were a number of people and distractions facing J.L.S. that could affect what she said. Finally, he said he had observed evidence of coaching in other cases and noted that a child is more "responsive" to it if it comes from someone they love. Coaching can both "contaminate" a child's memory or influence their "amenability to giving the statement."

Next, at the Commonwealth's request, the circuit court incorporated the prior testimony from Duffey, the behavioral health consultant. The Commonwealth then renewed its motions to have J.L.S.'s prior statements admitted under Code § 19.2-268.3. The circuit court rejected this motion after hearing argument.

Christine "Nini" Crider took the stand. She explained that she lived next door to the deceased, her father-in-law. She testified that on the day of the murder, she was on her way home and saw Snead walking on the road. She stopped, and he explained that he and the deceased had gotten into an argument. When she asked if Snead wanted her to give him a ride back, he explained that Gloria Crider was coming to get him. Christine recounted past stories where Snead had tried to intervene when the deceased was physically abusive towards Gloria.

Christine testified that on the day of the murder, she saw Snead and Gloria and J.L.S. returning home. Snead unbuckled J.L.S. and pointed for her to go to "Nini" Crider's. J.L.S. came towards her house. The next thing Christine saw was Gloria coming out the back door of the house "like it was nothing," and Snead "sprint[ing]" out of that house saying that "Poppa's

- 9 -

dead." Christine picked up J.L.S. and went next door. Christine left J.L.S. in the yard, entered the house, and she saw "this big puddle of blood." Christine testified that J.L.S. had not come into the house with her when she found the deceased's body. She "got herself together" and took J.L.S. to her house.

On redirect examination Christine identified the 911 recording from the incident. She described a voice on the recording, when they were outside, saying "don't let the baby in," and concluded that it "sounded like [Snead]" speaking. According to Christine, there was only "one way" J.L.S. could have seen the body — "the actual crime itself."

When asked about J.L.S., Christine testified that in her experience she was "in general . . . very honest." Christine then recounted her testimony from the prior hearing about J.L.S. saying "that her grandfather and her daddy were arguing and that her daddy had a stick that hits a ball and he hit her grandfather in the head with it," although the circuit court cautioned the jury that it was not offered for the truth of the matter asserted, and it was instead only to be considered "as a statement that the child made to her aunt."

Next, Brandy Shepard Walker testified, explaining that she was with J.L.S. in Christine Crider's house within hours of the murder. Walker said that she and J.L.S. were playing on the floor when J.L.S. asked her "did they get Poppa up and all the blood?" Walker did not know of anyone talking about the murder in front of J.L.S., although she did not know where J.L.S. had been before she arrived at the house.

The circuit court also heard testimony from a jailhouse informant, Johnny Owen Clay, who was incarcerated with Snead. According to Clay's testimony, Snead suggested to Clay that he help him "pin it to someone else." The plan was for Snead to give Clay details about the crime that were not widely known, so Clay could pretend that someone else had confessed. He said Snead told him he wished he could "put it off on" his grandmother "because she's old and

senile" but that she would not have been able to hit the deceased as hard as he had. Snead told Clay that he had been with his daughter and his grandmother in the house on the morning of the murder. Snead hit his grandfather in the head with an iron pipe four times after they had been arguing because his grandfather "put his hands on his grandmother" after he had been drinking. Snead then said he took his shoes off and took them and the pipe and disposed of them where "they wouldn't be found."

The Commonwealth once again renewed its motion to have J.L.S.'s prior statements admitted. The circuit court ultimately ruled that J.L.S.'s prior statements were admissible for two different reasons, first, because J.L.S. could be impeached with her prior statements, and second, under Code § 19.2-268.3. Upon that motion being granted and these statements being deemed admissible, Lester testified to the same facts he recounted at the pre-trial hearing.

A jury found Snead guilty of first-degree murder and child endangerment. He received a sentence of twenty years in prison for the former and two years for the latter. Snead moved for the circuit court to set aside the verdict because J.L.S.'s out-of-court statements violated his right to confront the witnesses against him. The circuit court denied the motion, finding that no Confrontation Clause issue existed.

This appeal followed.

II. ANALYSIS

Snead assigns three errors: (1) the circuit court erred in finding J.L.S. competent to testify, (2) Snead was "denied his right to due process and to confront his accuser," and (3) the circuit court erred in admitting J.L.S.'s testimony.[9]

---

[9] Snead assigns error to admitting J.L.S.'s "testimony," but his argument plainly concerns her prior statements. The Commonwealth asserts that Snead's assignment of error thus fails to encompass his argument as required by Rule 5A:12; however, given that Snead's Confrontation

- 11 -

A. *Competency*

"No child will be deemed incompetent to testify solely because of age." Code § 8.01-396.1. Instead, a trial court determines a child witness' competence by ensuring that he or she: (1) has "sufficient mental capacity to observe the data" and remember it; (2) "understand[s] questions put to [him or her] and be able to give intelligent answers"; and (3) exhibit[s] a "sense of moral responsibility, at least to the extent of a consciousness of a duty to speak the truth." Rogers v. Commonwealth, 132 Va. 771, 773 (1922). We review a trial court's ruling on the competence of the child witness for an abuse of discretion. Ortiz v. Commonwealth, 276 Va. 705, 712 (2008).

Snead argues that the inconsistencies in J.L.S.'s testimony required the circuit court to conclude that she was not competent to testify. Yet inconsistency is not dispositive in assessing a child's mental capacity or competence. See id. at 721 (noting that even if a child witness was influenced to testify falsely, it "affect[ed] the weight of her testimony, not her competency as a witness"). Here, the circuit court heard extensive evidence and made detailed findings regarding J.L.S.'s competency. It found that J.L.S. demonstrated good observational and recall skills. It found her mature and "highly competent," noted she had good verbal skills, and was "impressive." It found that J.L.S. knew the difference between the truth and lies, and she knew it was "not okay to tell lies." J.L.S. could distinguish between "make believe and real." The circuit court noted indications that she was not simply repeating something someone directed her to say and that she was able to correct others when they misspoke. These findings were supported by the footage of the forensic interview, as well as testimony from Potter, Duffey, and

---

Clause argument hinges on these prior statements being "testimonial," we decline to find the argument waived on Rule 5A:12 grounds.

Danielson. The circuit court carefully considered the relevant factors and did not abuse its discretion in finding J.L.S. competent to testify.

## B. *Confrontation Clause*

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Such protection only applies to "testimonial" statements. Sanders v. Commonwealth, 282 Va. 154, 162 (2011). In considering whether a statement is testimonial, we consider the "primary purpose" of the statement, id. at 163 (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)), and whether it was made "for use at a later trial," id. (quoting Crawford v. Washington, 541 U.S. 36, 52 (2004)).

Here, J.L.S.'s statements were not testimonial. As the Supreme Court of the United States has noted, "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause," Ohio v. Clark, 576 U.S. 237, 247-48 (2015), as few small children are speaking with future legal proceedings in mind. Here, neither J.L.S.'s statements to Lester nor in the forensic interview can be reasonably construed to have been made with J.L.S. contemplating their "use at a later trial." As such, they are not testimonial and do not implicate the Confrontation Clause.

Moreover, "the Confrontation Clause does not allow the admission of testimonial statements of a witness who did not testify at trial 'unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Sanders, 282 Va. at 162 (quoting Crawford, 541 U.S. at 53-54 (second alteration in original)). Here, there was no showing that J.L.S. was "unavailable to testify" or that the defense had no "prior opportunity for cross examination." To the contrary, she did testify and was subject to cross. Although J.L.S.'s prior out-of-court statements were admitted after her live testimony had concluded, Snead failed

- 13 -

to request that J.L.S. be recalled as a witness, nor did he object on this specific basis. For these reasons, Snead cannot say the circuit court denied him the right to confront a witness against him.

C. *Admissibility of J.L.S.'s Prior Statements*

The circuit court admitted J.L.S.'s statements to Lester and to the forensic interviewer on two different grounds: (1) as impeachment evidence; and (2) under Code § 19.2-268.3. Yet on appeal, Snead only challenges the latter of those two bases for their admission. "It is well-settled that a party who challenges the ruling of a lower court must on appeal assign error to each articulated basis for that ruling." Rankin v. Commonwealth, 297 Va. 199, 202 (2019) (quoting Ferguson v. Stokes, 287 Va. 446, 452 (2014)).

Snead's failure to assign error to the circuit court's alternate holding waives any challenge to the admissibility of J.L.S.'s statements. Nevertheless, "[t]he fact that an appellant 'has not assigned error to each basis for [a lower] court's ruling does not end the inquiry.'" Id. at 202 (second alteration in original) (quoting Manchester Oaks Homeowners Ass'n, Inc. v. Batt, 284 Va. 409, 422 (2012)). "Instead, we determine whether any unchallenged basis 'provides a sufficient legal foundation for the [lower court's] ruling.'" Id. (quoting Manchester Oaks, 284 Va. at 422). "In making this determination, 'we do not examine the underlying merits of the alternative holding — for that is the very thing being waived by the appellant as a result of his failure to [assign error to it] on appeal.'" Id. (alteration in original) (quoting Manchester Oaks, 284 Va. at 422).

Here, the lower court found that J.L.S.'s prior statements were admissible on two bases, and Snead fails to address or assign error to one — that the statements were admissible for impeachment purposes. A finding that evidence is admissible for purposes of impeachment of a witness is a proper foundation for admissibility of prior statements. Va. R. Evid. 2:607; see also

- 14 -

<u>Luck v. Commonwealth</u>, 30 Va. App. 36, 47 (1999) (extending this rule to apply to impeachment of hearsay declarants). Accordingly, by failing to challenge both grounds for admission, and because impeachment is a proper purpose for admission, Snead has waived this argument on appeal.

### III. CONCLUSION

The circuit court did not err in finding J.L.S. competent to testify. Nor did it deny Snead his right to confront a witness against him. Snead has waived the argument that J.L.S.'s prior statements were inadmissible. Accordingly, we affirm.

<u>Affirmed.</u>