J-S28026-25                    2026 PA Super 10

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NIKODA RUSSELL SMITH | : | |
| | : | |
| Appellant | : | No. 1445 MDA 2024 |

Appeal from the Judgment of Sentence Entered May 9, 2024
In the Court of Common Pleas of Perry County Criminal Division at
No(s): CP-50-CR-0000612-2022

BEFORE: BOWES, J., OLSON, J., and KING, J.

OPINION BY OLSON, J.:                    **FILED: JANUARY 15, 2026**

Appellant, Nikoda Russell Smith, appeals from the May 9, 2024 judgment of sentence entered in the Court of Common Pleas of Perry County after a jury convicted Appellant of aggravated indecent assault – without complainant's consent, aggravated indecent assault – complainant unconscious or unaware, indecent assault – without complainant's consent, and indecent assault – complainant unconscious or unaware.[1]  Appellant was sentenced to an aggregate term of 25 to 50 years' incarceration to be followed by three years' probation.[2]  Appellant was also required to register, for the

_____

[1] 18 Pa.C.S.A. §§ 3125(a)(1), 3125(a)(4), 3126(a)(1), and 3126(a)(4), respectively.

[2] The trial court imposed separate, but concurrent, sentences of 25 to 50 years' incarceration for each of Appellant's four criminal convictions.  Although the trial court stated that "the sentences [] merge with each other for sentencing purposes," it is the **criminal offenses** that merge for sentencing purposes with a sentence being imposed on only the highest graded offense.

remainder of his life, as a Tier III offender under Subchapter H of Pennsylvania's Sexual Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S.A. §§ 9799.10 - 9799.42.[3]   After careful review, we affirm the judgment of sentence.

The factual circumstances underlying Appellant's criminal convictions are summarized as follows:

> [The victim] was a friend of Appellant's friend, [Walter] Baumgartner [("Baumgartner")], and was attending a party at [Appellant's] residence on the night of October 1, 2022, as a guest of [Baumgartner].  Later in the night, [the victim] fell asleep on

_____

Sentencing Order, 5/10/24; **see also** 42 Pa.C.S.A. § 9765 (stating, "**No crimes** shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense.  **Where crimes merge for sentencing purposes**, the [trial] court may sentence the defendant only on the higher graded offense." (emphasis added)).  Merger of sentences occurs, pursuant to Section 9765, only when the statutory elements of one offense are included in the statutory elements of another offense and both crimes arise from a single criminal act.  42 Pa.C.S.A. § 9765; **see also Commonwealth v. Baldwin**, 985 A.2d 830, 837 (Pa. 2009).  The criminal offenses for which Appellant was convicted each include an additional element not found in the other offenses.  Therefore, Appellant's sentences do not merge pursuant to Section 9765.

Here, in fashioning Appellant's punishment, the trial court imposed concurrent sentences, and Appellant has not alleged that his sentences exceeded the trial court's statutory authority, posed a risk of double jeopardy, or penalized him in the absence of evidentiary proof of all elements beyond a reasonable doubt. Appellant's term of probation was set to run consecutively to the term of incarceration.  Therefore, Appellant's **lawful**, aggregate sentence was 25 to 50 years' incarceration to be followed by three years' probation.

[3] The trial court found that, based upon the report issued by the Sexual Offenders Assessment Board, Appellant was not a sexually violent predator. Trial Court Order, 5/10/24.

the sofa in the living room of Appellant's home, along with [Baumgartner]. At this time, [the victim] testified that she had been extremely intoxicated. [The victim] testified that while she was sleeping, her pants had been forcefully pulled down by the waistband, and she [] felt Appellant swipe his penis from her vaginal area to her buttock and then subsequently insert[] his penis into her rectum. [The victim] was able to identify that it was Appellant who committed the act[,] when it was occurring, [because] she was able to turn her head to get a glimpse of him[. A]lso, she testified that Appellant then fell off [] the [sofa] onto the floor[] and[,] at that time, [Appellant's wife] entered the living room yelling at Appellant, asking him why his pants were down. [The victim] testified that[,] the day after the [episode], she was experiencing some pain [in] her [buttock area], as well as some pain when trying to urinate. [The victim] decided to go to [an] urgent care [clinic] to request a sexual assault kit, a pregnancy test, a drug test, and [a sexually transmitted infection ("STI")] test. She then testified further that the results of those tests [indicated] that she was suffering from [c]hlamydia and a urinary tract infection.

Further, the Commonwealth provided the testimony of [Baumgartner] who testified that[,] on the night of October [1], 2022, he fell asleep alongside [the victim] on the [sofa] at Appellant['s residence] after attending a housewarming party. In the middle of the night, he was awoken by Appellant's wife[] yelling at Appellant who was [lying] on the floor with his pants down. He further testified[] that he was informed by [the victim] of Appellant's actions the next day through [textual messaging].

The Commonwealth also provided the testimony of Appellant's wife[, who] at times had wavering credibility[. Appellant's wife] testified that she came downstairs in the middle of the night to find Appellant on the living room floor with his pants down below his waist. [Appellant's wife] was unsure of how her husband fell into that position, but she believed that it was due to him [] using the bathroom, possibly relieving himself on [the couple's] front lawn, as he had done in the past.

Trial Court Opinion, 1/21/25, at 3-4 (record citations omitted).

On October 24, 2023, a jury found Appellant guilty of the aforementioned criminal acts.[4]  On May 9, 2024, the trial court sentenced Appellant, as discussed *supra*.  On May 20, 2024, Appellant filed a timely post-sentence motion.  The trial court denied Appellant's post-sentence motion on September 6, 2024.[5]  This appeal followed.[6]

Appellant raises the following issues for our review:

[1.]  Was the jury's verdict against the weight of the evidence in that the Commonwealth failed to present sufficient evidence as to each element of the crime of indecent assault?

[2.]  Did the [trial] court err in allowing Dr. [Richard] Azzaro[ ("Dr. Azzaro")], Tammy Bimber[,] and the victim to testify about [the] victim's medical examinations and diagnosis?

[3.]  Did the [trial] court err when it allowed the Commonwealth to impeach its own witness, namely [Appellant's wife]?

Appellant's Brief at 11 (extraneous capitalization omitted).[7]

Appellant's first issue raises a claim that the jury's verdict was against the weight of the evidence on the ground that "the victim's testimony was inconsistent and contradicted the testimony of another Commonwealth

_____

[4] The jury found Appellant not guilty of rape, 18 Pa.C.S.A. § 3121(a)(3), and sexual assault, 18 Pa.C.S.A. § 3124.1.  Verdict, 10/25/23.

[5] Appellant's judgment of sentence was made final by the denial of his post-sentence motion.

[6] Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

[7] We note that the Commonwealth did not file an appellate brief in opposition to Appellant's claims of error.

witness, Baumgartner, who was on the [sofa] at the time [Appellant committed the criminal acts against the victim.]"[8] *Id.* at 16-17.

> Appellate review of a weight claim is a review of the exercise of [the trial court's] discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial [court] had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial [court] when reviewing a trial court's determination that the verdict is[, or is not,] against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was[,] or was not[,] against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Horne*, 89 A.3d 277, 285 (Pa. Super. 2014), *citing*

*Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000); *see also*

*Commonwealth v. Rodriguez*, 340 A.3d 334, 349 (Pa. Super. 2025)

(stating, "the function of an appellate court is to review the trial court's

---

[8] A claim that the jury, as fact-finder, should have credited one witness's testimony over another witness's testimony goes to the weight, and not the sufficiency, of the evidence. *Commonwealth v. W.H.M., Jr.*, 932 A.2d 155, 160 (Pa. Super. 2007); *see also Commonwealth v. Wilson*, 825 A.2d 710, 713-714 (Pa. Super. 2003) (stating, a sufficiency of the evidence claim "does not include an assessment of the credibility of the testimony offered by the Commonwealth[; s]uch a claim is more properly characterized as a weight of the evidence challenge"); *Commonwealth v. Gaskins*, 692 A.2d 224, 227 (Pa. Super. 1997) (stating, "credibility determinations are made by the fact[-]finder and [] challenges [to those determinations] go to the weight, and not the sufficiency, of the evidence").

Notwithstanding the phrasing of Appellant's claim as concerning the sufficiency of the evidence to support each element of indecent assault, we find Appellant's claim is more properly construed as a challenge to the weight of the evidence.

exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence" (citation omitted)). A trial court abuses its discretion "where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill-will." *Horne*, 89 A.3d at 285-286 (citation omitted); *see also Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (stating, "[t]he term 'discretion' imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the [trial court]"). By comparison, "the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." *Rodriguez*, 340 A.3d at 349 (citation omitted). For an appellant to prevail on a weight of the evidence claim, "the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks the conscience of the [trial] court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003) (citation and internal quotation marks omitted), *appeal denied*, 833 A.2d 143 (Pa. 2003).

In support of his weight of the evidence claim, Appellant argues that the victim and Baumgartner, "both Commonwealth witnesses, had contradictory testimony as to the events [on the night of the incident] despite being on the [sofa] together." Appellant's Brief at 23. According to Appellant, the victim

testified that after Appellant forcefully ripped her pants down and penetrated her rectum with his penis, she "jolted like really hard" and Appellant fell to the floor. *Id.* at 18. The victim stated that the force of Appellant's penetration and her "jolt" were so great that it awoke Baumgartner, who, in turn, pushed Appellant off the victim. *Id.* at 20-21. The victim further testified that, afterward, Baumgartner helped her pull up her pants and covered her with a blanket. *Id.* at 19.

According to Appellant, Baumgartner, during his trial testimony, denied that he was awakened by Appellant's actions and further denied that he pushed Appellant off the victim, helped her pull up her pants, or covered her with a blanket. *Id.* at 21. Baumgartner testified that he awoke only after he heard Appellant's wife yelling at Appellant about lying on the floor with his pants down. *Id.* at 22. Appellant contends that the victim's subsequent textual message to Baumgartner asking him if they engaged in sexual intercourse the prior evening demonstrates that the victim was "uncertain of what occurred, if at all, and by whom." *Id.* at 22.

In denying the request for a new trial based upon Appellant's weight of the evidence claim, the trial court explained

> Hearing all the evidence, the jury was free to believe all, part, or none of [the victim's] testimony. However, despite differing testimony by Appellant['s] wife[ and Baumgartner,] as well as some inconsistencies in [the victim's] testimony, none of the evidence presented by the Commonwealth contradicted human experience or the laws of nature. Simply put, the jury found [the victim's] testimony that Appellant had sexual contact with her credible, and that testimony clearly proved every element of the charged crimes. Having had the benefit of observing the victim's

demeanor on the witness stand and manner of testifying, the [trial] court concludes that the jury's finding of guilt based on that evidence does not shock one's sense of justice.

Trial Court Opinion, 1/21/25, at 4 (citations omitted).

Critical to finding Appellant guilty of aggravated indecent assault and indecent assault was the jury's determination of witness credibility.[9]  In denying Appellant's post-sentence motion raising a weight of the evidence claim, the trial court considered the evidence presented at trial and the reasonableness of the jury's credibility determinations.  In particular, the trial court noted that Appellant's wife's explanation as to why her husband was found lying on the floor with his pants down contradicted the victim's testimony regarding the same episode.  The trial court also noted that the victim testified that she was able to identify Appellant as the perpetrator because she was able to turn her head and "catch a glimpse of him."  Appellant's assertion that the trial court erred in denying his weight claim based upon the inconsistencies in the victim's testimony and the fact that portions of the victim's testimony were contradicted by other witnesses,

---

[9] Although Appellant states, in his first issue, that he is challenging the weight of the evidence as it relates to his "indecent assault" convictions, his appellate brief sets forth the argument that his convictions for both **aggravated** indecent assault and indecent assault were contrary to the weight of the evidence.  We note that Appellant was charged under two subsections of the aggravated indecent assault statute and, similarly, two subsections of the statutory provision defining indecent assault.  In substance, Appellant's argument challenged the reliability of the victim's testimony, both as to the nature of the attack and the identity of the perpetrator.  As such, we will consider Appellant's claim as a global challenge to the weight of his aggravated indecent assault and indecent assault convictions.

namely Appellant's wife and Baumgartner, invites this Court to do nothing more than alter the result reached by the fact-finder by reassessing witness credibility and reweighing the evidence presented at trial, which the trial court, based upon its observations, found worthy of belief. We decline Appellant's invitation since the jury, while passing on the credibility of the witnesses and weight of the evidence, was free to believe all, part, or none of the evidence. *Commonwealth v. Dunkins*, 229 A.3d 622, 634 (Pa. Super. 2020), *aff'd*, 263 A.3d 247 (Pa. 2021), *cert. denied*, 142 S.Ct. 1679 (2022). Moreover, we discern no abuse of discretion in the trial court's determination that Appellant's convictions of aggravated indecent assault (two counts) and indecent assault (two counts) were not against the weight of the evidence.

In his second issue, Appellant challenges the trial court's ruling on the admissibility of certain evidence. "On a challenge to a trial court's evidentiary ruling, our standard of review is one of deference." *Commonwealth v. Hernandez*, 39 A.3d 406, 411 (Pa. Super. 2012), *appeal denied*, 63 A.3d 1244 (Pa. 2013). "The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court [] abused its discretion." *Hernandez*, 39 A.3d at 411 (citation omitted).

Appellant asserts that the trial court erred in qualifying Dr. Azzaro as an expert in victim behavior and dynamics of sexual assault and by admitting, as evidence, Dr. Azzaro's written report because the report contained impermissible assessments as to the victim's credibility. Appellant's Brief at 27-28.

Determining whether a witness may testify as an expert is a matter within the sound discretion of the trial court, whose decision will only be reversed for a clear abuse of discretion. In order to qualify as an expert in a given field, a witness must possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation.

*Yacoub v. Lehigh Valley Med. Assoc., P.C.*, 805 A.2d 579, 591 (Pa. Super. 2022) (*en banc*) (citations and quotation marks omitted), *appeal denied*, 825 A.2d 639 (Pa. 2003). Furthermore, Section 5920 of the Judicial Code states that, in criminal proceedings related to charges brought under Chapter 31 (sexual offenses) of the crimes code,

a witness may be qualified by the [trial] court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences[,] or victim services issues, related to sexual violence or domestic violence, that will assist the trier[-]of[-]fact in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence[,] and the impact of sexual violence or domestic violence on victims during and after being assaulted.

42 Pa.C.S.A. § 5920.

In admitting Dr. Azzaro as an expert, the trial court found that Dr. Azzaro

has been practicing for [35] years and is a clinical social worker licensed in Pennsylvania[. H]e obtained a doctorate in clinical social work from the University of Pennsylvania, and he has done research on behaviors of sexual trauma and victims. Dr. Azzaro also testified that he has [qualified previously] as an expert in the field of sexual trauma and victims in other counties in

- 10 -

Pennsylvania, and has [qualified previously] as an expert in domestic violence in Maryland.

Trial Court Opinion, 1/21/25, at 6 (extraneous capitalization omitted).

At trial, Dr. Azzaro testified that he was "a licensed clinical social worker in Pennsylvania [and he has] a doctorate in clinical social work from the University of Pennsylvania." N.T., 10/23/23, at 154. Dr. Azzaro has "over 35 years of practice experience working with victims of trauma, all forms of trauma" but his area of expertise "is focused primarily on sexual trauma and victims." *Id.* Dr. Azzaro "worked with probably [] several hundred to a thousand victims of sexual violence" including men, women, and children. *Id.* Dr. Azzaro stated that he has "done research related to victim behaviors and sexual assault [and] presented trainings across the country regarding victim behaviors related to sexual assault." *Id.* at 155. Dr. Azzaro also authored a research dissertation "that talks about victim behavior related to victims of sexual assault." *Id.*

Based upon Dr. Azzaro's testimony regarding his qualifications and his extensive and specialized training in victim behaviors related to sexual assault, we discern no abuse of discretion in the trial court's decision to admit Dr. Azzaro as an expert. To the extent that Appellant asserts that Dr. Azzaro was not qualified as an expert because he did not recognize rape trauma syndrome as a legitimate diagnosis, we do not find this assertion sufficient to

disqualify Dr. Azzaro as an expert.[10]  **See James v. Albert Einstein Med. Ctr.**, 170 A.3d 1156, 1162 (Pa. Super. 2017) (stating, it is "for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness").  Appellant was free to challenge Dr. Azzaro's opinions and views regarding rape trauma syndrome on cross-examination.  Furthermore, having explored Dr. Azzaro's views before the fact-finder, Appellant was then free to make the case that Dr. Azzaro's opinions did not merit belief.  In short, Dr. Azzaro's refusal to recognize rape trauma syndrome as a legitimate diagnosis did not support his rejection as an expert witness.

Regarding the admission of Dr. Azzaro's written report, "[i]t is well-settled that expert testimony on the issue of a witness's credibility is

_____

[10] Rape trauma syndrome has been explained as

> one kind of post-traumatic stress disorder.  The essential feature of [a] post-traumatic stress disorder is the development of characteristic symptoms after a psychologically traumatic incident that is usually beyond the range of ordinary human experience.  Those symptoms typically involve reexperiencing the traumatic incident; numbing of responsiveness to, or lessened involvement with, the external world; and a variety of autonomic, dysphoric, or cognitive symptoms.

**Commonwealth v. Pickford**, 536 A.2d 1348, 1351 n.2 (Pa. Super. 1987); **see also** https://my.clevelandclinic.org/health/diseases/rape-trauma-syndrome (last visited Dec. 16, 2025) (stating, "Rape trauma syndrome is the emotional, physical and behavioral response to rape and other forms of sexual assault.  It's a type of post-traumatic stress disorder [] specific to non[-]consensual sexual acts.").

impermissible, as it encroaches on the province of the jury to make such determinations." ***Commonwealth v. Jones***, 240 A.3d 881, 896 (Pa. 2020). Previously, our Supreme Court, in ***Commonwealth v. Dunkle***, 602 A.2d 830 (Pa. 1992), defined the scope of admissibility for expert testimony in cases involving sexual assault or sexual abuse and broadly proscribed that **all** expert testimony which even purported to touch upon the credibility of a witness, including expert testimony regarding victim responses and behaviors in the aftermath of sexual assault, impermissibly interfered with a jury's province of determining witness credibility. ***Id.*** at 837-838. Originally enacted in 2012, Section 5920 altered Pennsylvania's prohibition regarding the admissibility of expert testimony in cases involving sexual assault or sexual abuse. Section 5920 states, in pertinent part, that once an individual is qualified under Section 5920(b)(1) as an expert in a criminal proceeding involving, *inter alia*, sexual offenses, the expert "may testify to facts and opinions regarding specific types of victim responses and victim behaviors" but the expert's "opinion regarding the credibility of any other witness, including the victim, shall not be admissible." 42 Pa.C.S.A. § 5920(b)(2) and (3).

In ***Jones***, our Supreme Court analyzed whether, or not, Section 5920 effectively abrogated its decision in ***Dunkle***, ***supra***. ***Jones***, 240 A.3d at 896. The ***Jones*** Court declined to read its prior holding in ***Dunkle*** as being so broad as to "preclude **all** expert testimony concerning victim responses and behaviors to sexual assaults." ***Jones***, 240 A.3d at 896 (emphasis added). Rather, the ***Jones*** Court held that "[w]hile some testimony on [the topic of

- 13 -

victim responses and behaviors to sexual assault] may be prohibited for impermissibly invading the jury's province of determining [witness] credibility," not all testimony was prohibited. *Id.* at 896-897. The **Jones** Court explained that "a properly qualified expert [under Section 5920(b)(1)] may testify to facts and opinions regarding specific types of victim responses and behaviors in certain criminal proceedings involving sexual assaults, provided [the expert does] not offer opinions regarding the credibility of any witness, including the victim." *Id.* at 897, *citing* 42 Pa.C.S.A. § 5920(b)(3). Our Supreme Court went on to state that whether, or not, an expert, properly qualified under Section 5920(b)(1), offers an opinion regarding the credibility of a witness must be assessed on a case-by-case basis. *Id.* at 897.

At trial, Appellant objected to a portion of Dr. Azzaro's report, which reads as follows:

> **Common Issues:**
>
> **Why do victims stay/go back/continue to communicate with their offenders?**
>
> - A victim's response to a traumatic event, such as rape, should not be used as evidence as to whether or not the rape occurred. When the victim knows her assailant[,] her experience of the assault can be complicated by pre-existing love or feelings for the assailant, or even out of fear.
>
> - In some cases, victims try to normalize their experience by sexually re-engaging or continuing a relationship with the offender in an attempt to cope with the assault. It is seen as counterintuitive because the response differs from what the social and cultural norm expects the victim's response to be.

- Mainstream and pornographic media reinforce cultural norms that indicate that it is a woman's "duty" to have sex with her partner. This notion can mislead female victims into blaming themselves for the unwanted sexual encounter or believing they are bad partners because they did not enjoy sex against their will.

- There is a misperception by many mental health and criminal justice providers that people who buy and use drugs cannot be victims of sexual violence.

- The relationship between sexual assault and drug use is bi-directional. Substance use increases an individual's risk of sexual violence. Commonly, victims use drugs or alcohol as a way of coping with the traumatic experience of sexual assault.

- When a victim is intoxicated by drugs or alcohol, they are unable to give consent. This should not be misunderstood as the cause of the assault.

- Perpetrators often use substances like alcohol or drugs to incapacitate their victims to help make it easier to sexually assault them.

- When targeting victims, perpetrators often seek people who are vulnerable and have less power. These targets include people with addictions or who use drugs or alcohol. Perpetrators target such individuals because they are less likely to report the assault or when they do, they are less likely to be believed or deemed credible.

- Victims respond to trauma in a variety of individual ways. It is not uncommon for victims to demonstrate a limited or full range of emotions. For example, some victims are flat and constricted during interviews/testimony while the same victim may express other emotions[,] *i.e.*[,] sadness and anger[,] at other times. A common misperception is that victims should respond in a certain manner.

Commonwealth Exhibit 9 at 2-3 (unpaginated).

Appellant argued, at trial, that Dr. Azzaro's report "create[ed] the impression for the jury that these things made the person credible and that's

- 15 -

expressly what is not allowed by these types of experts." N.T., 10/23/23, at 166. The trial court responded that "[w]hat experts can't do is to say I find **this** victim credible or **that** victim credible." *Id.* (emphasis added). The trial court held that Dr. Azzaro's report "talk[ed] in generalities" and "generalized statements" and subsequently overruled Appellant's objection. *Id.* at 166-167.

Upon review, we concur with the trial court and the record supports that Dr. Azzaro's report, and subsequent testimony regarding the opinions outlined in his report, spoke in generalized terms regarding misconceptions held by the general public with regard to a victim's common responses to, and behavior associated with, sexual assault. *See generally*, *id.* at 164-173; *see also* Commonwealth Exhibit 9. For example, regarding the statement in Dr. Azzaro's report that "[p]erpetrators target such individuals [(referring to people with addictions or who use drugs and alcohol)] because they are less likely to report assault or when they do, they are less likely to be believed or deemed credible," Dr. Azzaro explained that

> Perpetrators of sexual violence and other forms of violence look for vulnerability. And one area of vulnerability is getting people to participate in the use of drugs and alcohol to create such vulnerability and incapacitate them on two different fronts: one, to reduce inhibitions and create opportunity, and the second is also as it pertains to sexual assault. Often times our mantra in society is that if we are under the influence, then a rape didn't occur. So a lot of times perpetrators will play into that narrative as well.

N.T., 10/23/23, at 170. Dr. Azzaro did not, at any point during his testimony, apply his opinions, as outlined in his report, to the sexual assault victim in the case *sub judice*. **Id.** In fact, on cross-examination, Dr. Azzaro testified that he was unaware of any of the factual allegations of the case *sub judice* and that his "testimony [has] nothing to do with what happened in this case[.]" **Id.** at 173. Because Dr. Azzaro did not offer an opinion regarding the credibility of the victim in this case, we discern no error in the trial court's decision to overrule Appellant's objection to the admission of Dr. Azzaro's report. **See Commonwealth v. Smith**, 206 A.3d 551, 562 (Pa. Super. 2019) (permitting expert testimony where the expert, having never met the victim or reviewed the records of the case, discussed in general terms victim responses to sexual assault), *appeal denied*, 217 A.3d 202 (Pa. 2019); **see also Commonwealth v. Beatty**, 335 A.3d 1236, 1250 (Pa. Super. 2025) (allowing an expert's opinion where the expert spoke in general terms and provided the jury with background information regarding the behavior of victims of sexual assault); **Commonwealth v. Cramer**, 195 A.3d 594, 608 (Pa. Super. 2018) (stating that, an expert's general testimony "about the manner in which victims of sexual abuse respond to an assault" was permissible because the export did not offer an opinion as to the credibility of the victim); 42 Pa.C.S.A. § 5920(b).

Next, as part of his second issue, Appellant asserts that the trial court erred in denying his motion *in limine* and admitting into evidence the

laboratory report that revealed the victim tested positive for chlamydia. *Id.* at 28-29; *see also* Commonwealth Exhibit 11.

At the hearing on Appellant's motion *in limine*, Appellant argued that the Confrontation Clause required the Commonwealth to call, as a witness at trial, the person who analyzed the samples obtained from the victim's medical examination and subsequently prepared a report summarizing the laboratory analysis, or to comply with Pennsylvania Rule of Criminal Procedure 574, which required the Commonwealth to provide notice, in advance of trial, of its intent to offer the laboratory report supported by a certification from the person who performed the analysis and authored the report. Appellant then asserted that, because the Commonwealth did not intend to call the individual who analyzed the samples and authored the laboratory report as a witness at trial and because the Commonwealth did not intend to comply with Rule 574, admission of the laboratory report violated Appellant's rights under the Confrontation Clause. N.T., 10/23/23, at 1-6, 12-13, 16-17, 22-25.

The Commonwealth responded that, because the report did not directly incriminate Appellant, it neither triggered protections under the Confrontation Clause nor compelled compliance with Rule 574. Rather, according to the Commonwealth, the physician's assistant, who treated the victim at the urgent care clinic, would testify that she ordered the laboratory analysis and subsequent report as part of the medical examination of the victim to determine whether, or not, further treatment for chlamydia was required. As such, the Commonwealth argued that admission of the laboratory report did

not violate Appellant's rights under the Confrontation Clause. *Id.* at 10-11, 13-15, 22.

Ultimately, the trial court determined that the laboratory report was non-testimonial and, thus, did not implicate Appellant's rights under the Confrontation Clause. Instead, the trial court stated the report would be admissible under the business records exception to the rule against hearsay, as discussed in greater detail *infra*, so long as the Commonwealth called the physician's assistant to testify at trial to support application of the hearsay exception.[11] *Id.* at 19, 25.

It is well-settled that, in reviewing a trial court's order granting or denying a motion *in limine*, "we apply an evidentiary abuse of discretion standard of review."[12] ***Commonwealth v. Stokes***, 78 A.3d 644, 654 (Pa. Super. 2013) (stating that, "[t]he admissibility of evidence is a matter

---

[11] The "business records" exception to the rule against hearsay is formally referred to as the "records of a regularly conducted activity" exception and is codified at Pennsylvania Rule of Evidence 803(6). For ease of reference, we refer to the records of a regularly conducted activity exception as the business records exception.

[12] "Consistent with [Pennsylvania Rule of Evidence] 103(a), a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court definitively rules on the motion." ***Commonwealth v. Reich***, 340 A.3d 997, 1008 (Pa. Super. 2025), *citing* ***Blumer v. Ford Motor Co.***, 20 A.3d 1222, 1232 (Pa. Super. 2011), *appeal denied*, 49 A.3d 441 (Pa. 2012).

Here, as discussed *supra*, the trial court definitively ruled on Appellant's motion *in limine* regarding the admission of the laboratory report. Therefore, Appellant preserved his claim of error without the need to renew it at trial.

directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion"), *appeal denied*, 89 A.3d 661 (Pa. 2014). Whether, or not, the admission of evidence violates the Confrontation Clause, however, raises a question of law for which our standard of review is *de novo* and our scope of review is plenary.

**Commonwealth v. Brown**, 185 A.3d 316, 324 (Pa. 2018).

> The Confrontation Clause of the Sixth Amendment, made applicable to the States *via* the Fourteenth Amendment, provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him [or her]. In [**Crawford v. Washington**, 541 U.S. 36, 51 (2004)], the [United States Supreme] Court held that the Sixth Amendment guarantees a defendant's right to confront those who bear testimony against him [or her], and defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.

**Commonwealth v. Yohe**, 79 A.3d 520, 530-531 (Pa. 2013) (citations, some quotation marks, brackets, ellipsis, and footnotes omitted). Article I, Section 9 of the Pennsylvania Constitution provides similar protections by guaranteeing that, in all criminal prosecutions, the accused has a right "to be confronted with the witnesses against him [or her]."[13] PA. CONST. art. I, § 9;

---

[13] Appellant has not asserted that the Pennsylvania Constitution affords him greater protections with respect to the right to confrontation than those protections provided by the United States Constitution. As such, our analysis is the same under both the United States Constitution and Pennsylvania Constitution. **Commonwealth v. Weeden**, 304 A.3d 333, 344 n.18 (Pa. 2023).

*see also Yohe*, 79 A.3d at 531 n.10. The ultimate goal of the protection afforded by the Confrontation Clause "is to ensure reliability of evidence, but [the protection] is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner by testing in the crucible of cross-examination." *Brown*, 185 A.3d at 326 (original quotation marks omitted), *quoting **Melendez-Diaz v. Massachusetts***, 557 U.S. 305, 317 (2009).

Prior to the decision in **Crawford**, *supra*, "the United States Supreme Court was of the view the Confrontation Clause did not bar the admission of out-of-court statements that fell within a firmly rooted exception to the hearsay rule or that bore a particularized guarantee of trustworthiness." **Brown**, 185 A.3d at 324, *citing **Crawford***, 541 U.S. at 40 and ***Ohio v. Roberts***, 448 U.S. 56, 66 (1980); *see also **Commonwealth v. Carter***, 932 A.2d 1261, 1265 n.3 (Pa. 2007). "In **Crawford**, however, the [High] Court sought to align its Confrontation Clause analysis with the original intent of the framers [of the United States Constitution] who, according to the [High] Court, were concerned about abuses of the civil-law mode of criminal procedure."[14] **Brown**, 185 A.3d at 324. The **Crawford** Court, confronted with the admissibility of a witness's recorded statement to police, determined that the

---

[14] "The primary object of the Confrontation Clause was to prevent depositions or *ex parte* affidavits, such as sometimes admitted in civil cases, being used against [a defendant in criminal cases] *in lieu* of a personal examination and cross-examination of the witness[.]" **Weeden**, 304 A.3d at 335 (Wecht, J. concurring), *quoting **Mattox v. United States***, 156 U.S. 237 (1895).

- 21 -

framers "would not have permitted the admission of testimonial statements of a witness who did not appear at trial, and held that such statements could be admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." **Id.** (original quotation marks omitted), *citing* **Crawford**, 541 U.S. at 59, 62 (stating, "[w]here testimonial statements are involved, we do not think the [f]ramers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability'"). Thus, **Crawford** refocused Confrontation Clause jurisprudence and declared that the introduction of extra-judicial statements of a "testimonial" nature implicated Confrontation Clause protection. **See Weeden**, 304 A.3d at 357 (Wecht, J. concurring).

In cases decided after **Crawford**, the High Court held that out-of-court statements are "'testimonial,' and thus subject to Confrontation Clause restraints, when their 'primary purpose' is to establish or prove past events for purposes of proof at a criminal trial." **Brown**, 185 A.3d at 325, *citing* **Davis v. Washington**, 547 U.S. 813, 822 (2006) (stating that, a statement is testimonial when, viewed objectively, "the primary purpose of the [statement] is to establish or prove past events potentially relevant to later criminal prosecution"). The **Crawford** Court, however left "for another day any effort to spell out a comprehensive definition of 'testimonial' [statements.]" **Crawford**, 541 U.S. at 68 (stating that, the term "testimonial"

"at a minimum" applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations").

Several years later, the United States Supreme Court, in *Melendez-Diaz*, *supra*, considered whether "certificates reporting the forensic analysis of the composition and quantity of substances seized from the defendant," such as cocaine, were "testimonial" and, thus, subject to Confrontation Clause constraints. *Brown*, 185 A.3d at 325. The *Melendez-Diaz* Court held that forensic "certificates are functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination[] and[,] thus[,] were 'testimonial' in nature. Moreover, the [High] Court held [that] admission of the certificates of analysis without the author's live testimony violated the Confrontation Clause because the certificates fell into the core class of testimonial statements identified in *Crawford*." *Id.* (original quotation marks, citations, and original brackets omitted), *citing Melendez-Diaz*, 557 U.S. at 310-311. In extending the reach of testimonial evidence to include written statements, such as certificates of analysis, the *Melendez-Diaz* Court noted that, "[s]ignificantly, the certificates of analysis were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available

for use at a later trial[.]"[15] **Brown**, 185 A.3d at 325 (original quotation marks

omitted), *citing* **Melendez-Diaz**, 557 U.S. at 311.

> In [**Bullcoming v. New Mexico**, 564 U.S. 547 (2011)], decided
> two years after **Melendez-Diaz**, the High Court reviewed the
> admissibility of a [blood alcohol content ("BAC")] report authored
> and signed by a non-testifying analyst.  The report was introduced
> at trial for the substantive purpose of proving the truth of the
> matter asserted by its out-of-court author, namely, that the
> defendant had a [certain] BAC level[,] which was the central
> question at the defendant's trial, and was dispositive of his guilt.
> The report was introduced through the testimony of a surrogate
> analyst.   The New Mexico Supreme Court held [that] the
> surrogate[']s testimony was adequate to satisfy the requirements
> of the Confrontation Clause.  The issue before the High Court was
> "whether the Confrontation Clause permits the prosecution to
> introduce a forensic laboratory report containing a testimonial
> certification - made for the purpose of proving a particular
> fact - through the in-court testimony of a scientist who did not
> sign the certification or perform or observe the test reported in
> the certification." **Bullcoming**, 564 U.S. at 652[.]  The High Court
> ruled [that] the Confrontation Clause precludes such practice,
> holding [that] "the Clause does not tolerate dispensing with
> confrontation simply because [a] court believes that questioning
> one witness about another's testimonial statements provides a fair
> enough opportunity for cross-examination." **Id.** at 662[.]

**Brown**, 185 A.3d at 326.  In emphasizing the High Court's reasoning for

finding that the BAC report was testimonial in nature, Justice Sotomayor, in

her concurring opinion in **Bullcoming**, *supra*, "noted the BAC report had a

---

[15] The **Melendez-Diaz** Court found that although the documents were
identified as "certificates" under Massachusetts law, they were "quite plainly
affidavits" in that they were "declarations of facts written down and sworn to
by the declarant before an officer authorized to administer oaths."
**Melendez-Diaz**, 557 U.S. at 310 (brackets omitted).  As affidavits, the
documents took on the *persona* of statements that an objective person could
reasonably believe would be available for use at a later trial.  **Id.** at 311.

primary purpose of creating an out-of-court substitute for trial testimony and opined the formality of the BAC report further suggests its evidentiary purpose."[16]  **Brown**, 185 A.3d at 326 (original quotation marks omitted), *citing* **Bullcoming**, 564 U.S. at 670 (Sotomayer, J. concurring).

> Shortly after **Bullcoming**, the High Court decided **Williams v. Illinois**, [567 U.S. 50 (2012)], a divided opinion in which the [High] Court sought to further refine its articulation of the primary purpose test under the alternate factual scenario envisioned only hypothetically in **Bullcoming** by Justice Sotomayor.[17]  **Williams** involved a rape prosecution in which an expert testified she obtained a [deoxyribonucleic acid ("DNA")] profile report from an independent [laboratory] based on a semen specimen taken from a vaginal swab of the [assault] victim.  **The [DNA profile] report was not introduced into evidence.**  The expert testified she compared the DNA profile contained in the [] report to the defendant's recorded DNA profile and concluded it was a match.  The defendant challenged the expert's testimony which relied upon the [DNA profile] report on the basis [that reference to the report] without testimony from its author violated the Confrontation Clause.

---

[16] Justice Sotomayor explained that the absence of notarization is not dispositive of the "formality" of a statement.  Rather, the fact that an analyst is asked to sign his or her name and certify to both the results and the statements made within the document is sufficient to deem the document a formal statement.  **Bullcoming**, 564 U.S. at 671 (Sotomayer, J. concurring).

[17] As discussed *supra*, the High Court in **Bullcoming** held that the BAC report, **which was admitted as evidence at trial**, was testimonial in nature because its primary purpose was to establish an element of the crime.  In her concurring opinion, Justice Sotomayer stated that the High Court "would [have] face[d] a different question [regarding] the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements **were not themselves admitted as evidence**."  **Bullcoming**, 564 U.S. at 673 (emphasis added) (Sotomayer, J. concurring).  As discussed *infra*, the **Williams** Court confronted the alternative scenario envisioned in Justice Sotomayer's remarks.  **Williams**, 567 U.S. at 67.

*Brown*, 185 A.3d at 327 (emphasis added). The plurality opinion in *Williams* held that the DNA profile "report was itself non-testimonial, and thus beyond the reach of the Confrontation Clause, because the report did not identify the defendant, was not inherently inculpatory, and was created before any suspect was identified."[18]  *Id.* (original quotation marks omitted), *citing Williams*, 567 U.S. at 58. Justice Thomas, while agreeing with the other four members of the High Court that the DNA profile did not violate the Confrontation Clause, differed in his reasoning because he believed the "statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." *Williams*, 567 U.S. at 104, *citing Michigan v. Bryant*, 562 U.S. 344 (2011). The dissent would have held that the DNA profile report was testimonial in nature and "the independent [laboratory] analyst who prepared the DNA profile report, to which the defendant's DNA sample was compared, was a witness against the defendant whom the defendant had a right to confront."[19]  *Brown*, 185 A.3d at 327-328, *citing Williams*, 567 U.S. at 123 (stating that, "the [DNA] report was made to establish some fact in a criminal proceeding" (original quotation marks omitted) (Kagan, J. dissenting)) and 125. Due to the plurality

_____

[18] The plurality opinion was authored by Justice Alito and was joined by Chief Justice Roberts, Justice Kennedy and Justice Breyer.  Justice Thomas concurred in the judgment.

[19] The dissent was  authored by Justice Kagan and joined by Justice Scalia, Justice Ginsberg, and Justice Sotomayor.

composition of the **Williams** decision, it never attained the status of binding precedent. **Yohe**, 79 A.3d at 536 (stating, "[w]hen a fragmented [High] Court decides a case and no single legal rationale explaining the results garners a majority, then 'the holding of the [High] Court may be viewed as that position taken by those [Justices] who concurred in the judgments on the narrowest grounds.'" (*quoting* **Marks v. United States**, 430 U.S. 188, 193 (1977)); **see also** Justin Pidot, *Tie Votes in the Supreme Court*, 101 Minn. L. Rev. 245, 245 (2016) (stating, "[s]ince at least 1792, the [High] Court has followed the rule that where the Justices are evenly divided, the lower court's decision is affirmed, and the Supreme Court's order has no precedential effect").

In light of the non-precedential value of the **Williams** decision, our Supreme Court, in subsequent decisions, returned to its own jurisprudence and the "primary purpose test" under **Crawford**, **Melendez-Diaz**, and **Bullcoming** for determining whether a statement is testimonial or non-testimonial. **See Weeden**, 304 A.3d at 350 n.23 (stating, "[w]hile[] **Williams** arguably invoked a new primary purpose test[,] this innovation was endorsed by only a plurality of the [High] Court; accordingly, we will adhere to the primary purpose test set out in the [High] Court's decisions spanning from **Crawford** to **Bullcoming**").

> [In **Yohe**, **supra**, our Supreme Court] addressed whether the admission of a toxicology report in a [driving under the influence ("DUI")] case violated the defendant's rights under the Confrontation Clause[. In **Yohe**, the] defendant's blood sample was tested three times by several analysts from one [laboratory] using two different methods, as *per* routine [laboratory] practice. Dr. Blum, a toxicologist, and the assistant [laboratory] director

responsible for the [laboratory's] quality assurance controls, received the raw data from the analysts who performed the tests, reviewed the demographic information, verified the appropriate tests were conducted, evaluated the chain of custody, and compared the individual test results to arrive at a BAC result which he set forth in a toxicology report summarizing the test results. *Yohe*, 79 A.3d at 523-[5]24. Dr. Blum signed the report electronically, certifying its content and his own participatory role in reviewing the data and ensuring its accuracy. *Id.* at 524. At Yohe's trial, the report showing his BAC [] was admitted into evidence through Dr. Blum's expert testimony. Yohe objected to the admission of the report and to Dr. Blum's testimony on the basis they violated his right to confrontation because the specific [laboratory] technicians who actually performed the tests did not testify. The objections were overruled, and Yohe was convicted of DUI and sentenced. On post-sentence motions, however, the trial court held the toxicology report was a testimonial statement requiring production at trial of the analysts who actually performed the underlying tests so that the defendant could confront them. *Id.* at 525-[5]26. The Commonwealth appealed to [this Court], arguing Dr. Blum was[,] in fact[,] the analyst who derived the actual BAC result from his comparison of the readings of the underlying tests conducted under differing methods. [This Court] agreed Dr. Blum (rather than the original [laboratory] technicians) was the witness the defendant had a right to confront, and reversed the grant of a new trial.

On appeal, [our Supreme] Court analyzed the relevant precedent from the High Court, viewing "with caution" the "fragmented" decision in *Williams* where there was no single rationale to explain the result which garnered a majority. [*Id.*] at 536. [The *Yohe*] Court noted the narrowest ground for the decision in *Williams* was the conclusion that the DNA profile report from the independent [laboratory] was not testimonial. However, four Justices disagreed with that conclusion and the remaining Justices could not agree about why the report was not testimonial. Thus, [the *Yohe*] Court considered whether Dr. Blum's toxicology report was testimonial by comparing it to "the facts of the testimonial statements considered in *Melendez-Diaz* and *Bullcoming*," *id.* at 537, and easily concluded the toxicology report was testimonial. *Id.* The *Yohe* Court then considered whether Dr. Blum was the appropriate analyst to appear at trial for purposes of protecting Yohe's rights under the Confrontation Clause. [Our Supreme] Court noted Dr. Blum had extensive supervisory

involvement in utilizing the information supplied by his subordinates and highlighted his unique role as the only individual who engaged in the critical comparative analysis of the results of the various tests performed to determine the defendant's actual BAC. *Id.* at 540. The *Yohe* Court surmised the facts distinguished the case from *Bullcoming* where the surrogate witness had no opinion concerning the defendant's BAC, "rather the testifying witness merely read the analyst's report into evidence and offered no independent opinion about the defendant's blood alcohol levels." *Id.* at 541, *citing Bullcoming*, 564 U.S. at 662[.] Thus, the *Yohe* Court determined the defendant's rights under the Confrontation Clause were not violated because the "author" of the toxicology report was the analyst who testified at trial and was available for cross-examination. [*Yohe*, 79 A.3d at 541.]

*Brown*, 185 A.3d at 328-329 (original brackets omitted).

In *Brown*, our Supreme Court considered "whether the challenged autopsy report - presented without accompanying testimony by its author[ - ]was testimonial in nature such that Brown's Sixth Amendment right to confront the witnesses against him was violated by its admission at trial." *Id.* at 329. Our Supreme Court recognized

cases from a number of jurisdictions hold autopsy reports are non-testimonial because they are not created primarily for presentation in a criminal trial and thus, the admission of the report without the supporting testimony of its author in criminal trials does not raise Confrontation Clause concerns. Pennsylvania law[, however,] requires the preparation of autopsy reports in all cases of sudden, violent, and suspicious deaths, or deaths by other than natural causes, and in such cases, the autopsy and subsequent report are designed to determine whether the death occurred as the result of a criminal act. Moreover, the law requires the coroner or medical examiner charged with conducting and reporting the results of such autopsies to consult and advise the local district attorney to the extent practicable.

*Id.* (citation omitted). The **Brown** Court concluded that an autopsy report is testimonial because

> the primary purpose for preparation of an autopsy report under these circumstances is to establish or prove past events potentially relevant to a later criminal prosecution and that any person creating the report would reasonably believe it would be available for use at a later criminal trial.

*Id.* The **Brown** Court further explained that "[b]ecause the autopsy report [] was testimonial in nature, under the **Crawford**, **Melendez–Diaz**, **Bullcoming**[,] and **Yohe** precedents, the report could properly be introduced into evidence without [the author's] accompanying testimony only if [its author] was unavailable and Brown had a prior opportunity to cross-examine [the author]." *Id.* (original quotation marks and citation omitted). Since Brown had no prior opportunity to cross-examine the author of the autopsy report, the **Brown** Court held that the admission of the report into evidence was error. *Id.*

To date, much has been decided in Pennsylvania with regard to whether BAC reports within DUI cases should be viewed as testimonial statements that implicate Confrontation Clause protections. Despite this, whether a laboratory report that contains the results of a STI test performed on a victim of sexual assault qualifies as a testimonial statement appears to be an issue of first impression for Pennsylvania courts.

Under **Crawford**, **Yohe**, and their progeny, we are able to glean that when a laboratory report is generated for the primary purpose of medical

diagnosis and treatment, the laboratory report reflecting test results is non-testimonial and, therefore, is not subject to the protections of the Confrontation Clause. **See, e.g., Commonwealth v. Banko**, 268 A.3d 484, 492 (Pa. Super. 2022) (finding that the BAC test results were obtained for the primary purpose of medical treatment after the defendant was transported to the hospital following the automobile accident because the defendant reported to be diabetic and complaining of pain; the test results were not obtained to establish or prove past events relevant to a later criminal prosecution), *appeal denied*, 279 A.3d 1176 (Pa. 2022); **see also Commonwealth v. McCullough**, 324 A.3d 582, 587 (Pa. Super. 2024) (finding that medical records containing objective information regarding the procedures performed and the victim's responses to treatment were not testimonial because they were not created for the primary purpose of future litigation); **Commonwealth v. Dougan**, 317 A.3d 619, 2024 WL 1267674, at *6 (Pa. Super. filed Mar. 26, 2024) (unpublished memorandum) (finding that because the BAC test results were obtained for the primary purpose of medical treatment and not at the request of law enforcement, the test results were non-testimonial). In some instances, however, a laboratory report is testimonial in nature and, therefore, subject to the protections of the Confrontation Clause when medical tests are performed on patients and the laboratory report reflecting the test results is subsequently generated for the primary purpose of proving elements of a crime in contemplation of criminal prosecution. **See, e.g., Commonwealth v. Barton-Martin**, 5 A.3d 363, 368

(Pa. Super. 2010), *appeal denied*, 30 A.3d 486 (Pa. 2011) (finding that BAC test results obtained for the primary purpose of establishing an element of the crime were testimonial); *see also Commonwealth v. Kearns*, 332 A.3d 1267, 2024 WL 5245135, at *7 (Pa. Super. filed Dec. 30, 2024) (unpublished memorandum) (finding that because the defendant was taken to the hospital for the primary purpose of developing evidence of his prior drug use, the test results were testimonial), *appeal denied*, ___ A.3d ___, 2025 WL 2527393 (Pa. filed Sept. 3, 2025) (slip copy).

In the case *sub judice*, whether, or not, the laboratory report containing the victim's STI test results  (Commonwealth Exhibit 11) is testimonial in nature requires us to examine the primary purpose for which the laboratory report was generated.   *Brown*, 185 A.3d at 329, *relying on Crawford*, *supra*, *Melendez-Diaz*, *supra*, *Bullcoming*, *supra*, and *Yohe*, *supra*.  If the primary purpose of the laboratory report reflecting the victim's STI test results was to prove past events potentially relevant to a later criminal prosecution, then the laboratory report is testimonial in nature and subject to the protections of the Confrontation Clause.  Conversely, if the laboratory report reflecting the victim's STI test results was primarily generated for medical treatment purposes, then the laboratory report is non-testimonial and, therefore, is not subject to the protections of the Confrontation Clause.

Based upon a review of the record presently before us, we find that the primary purpose of the laboratory report showing the victim's STI test results was to determine whether a medical condition existed and, if so, to allow the

physician's assistant to prescribe a necessary course of medical treatment. The facts in the case *sub judice* show (1) that the victim stated that she knew the perpetrator of the sexual assault and the STI test results were not used for identification (unlike, for example, a DNA test); (2) the victim expressed no interest in prosecution but, instead, sought treatment at the urgent care clinic to determine her medical condition, *i.e.*, was she pregnant, had she been drugged, or was she infected with an STI; and (3) the STI test was conducted at the request of a physician's assistant by a medical laboratory and not a criminal forensic facility. As such, the laboratory report was not created for the primary purpose of proving past events relevant to a later criminal prosecution for sexual assault crimes and, therefore, was non-testimonial in nature. The fact that the Commonwealth later attempted to link Appellant to the perpetration of the sexual assault against the victim by establishing, through use of the laboratory report, that both Appellant and the victim tested positive for chlamydia does not change the non-testimonial nature of the evidence. Rather, we examine the circumstances under which the statement was prepared to determine the primary purpose of the statement, without regard for the ultimate use to which the statement is later put.

In reaching our conclusion that a laboratory report showing the STI test results of the victim in the case *sub judice* is non-testimonial in nature because it was generated for the primary purpose of medical treatment and not in contemplation of future criminal prosecution, we are persuaded by the decisions of other state courts that were faced with similar circumstances and

tasked with determining whether, or not, statements made during a sexual assault examination were testimonial in nature.[20]

In **State v. Burke**, 478 P.3d 1096 (Wash. 2021) (*en banc*), *cert. denied*, 142 S.Ct. 182 (2021), the Washington Supreme Court analyzed whether, or not, statements a victim made to a sexual assault nurse examiner during the course of a sexual assault examination were testimonial in nature.[21]  In **Burke** the victim sought treatment in the emergency room of a hospital after she was raped in a nearby park.  **Burke**, 478 P.3d at 1102-1103.  As part of the examination, the sexual assault nurse examiner recorded verbatim certain information provided by the victim as part of the patient history which included, *inter alia*, the victim's description of the location of the assault and the assailant's appearance, as well as the victim's answers to specific questions about penetration, ejaculation, contraception, her position during the assault, strangulation, grasping, grabbing, or holding, and the victim's level of pain.  **Id.** at 1103.  The sexual assault nurse examiner stated that the answers provided by the victim "guid[ed] her to look for injuries as well as evidence."  **Id.**  Burke objected that the admission of the victim's statements

---

[20] "This Court may cite to the decisions of other states for persuasive authority."  **Commonwealth v. Rosendary**, 313 A.3d 236, 244 n.9 (Pa. Super. 2024) (citation omitted).

[21] The Washington Supreme Court explained that "[s]exual assault nurse examiners are medical professionals with specialized evidence-collecting skills and training that supplement their medical training."  **Burke**, 478 P.3d at 1109.

*vis-à-vis* the sexual assault nurse examiner's trial testimony violated his right to confront the victim because the victim's statements were testimonial.[22] *Id.* at 1106. The Washington Supreme Court, applying the primary purpose test under *Crawford*, held that

> [w]ith the exception of one statement describing the assailant[,] the primary purpose of [the victim's] statements during the sexual assault exam[ination] was to receive medical care. Thus, the statements were non[-]testimonial and their admission did not violate the [C]onfrontation [C]lause.

*Id.* at 1112. In reaching its conclusion, the *Burke* Court recognized that while the victim's statements served both forensic and medical purposes, the Confrontation Clause "requires [courts] to identify a **singular dominant purpose** to determine whether statements are testimonial." *Id.* at 1108 (emphasis added), *relying on Davis*, 547 U.S. at 822. The *Burke* Court explained that "[t]he role of the person the declarant is speaking to is significant to determining the primary purpose of a statement" and that, although a sexual assault nurse examiner "shares features with both medical providers [(duty to provide medical care)] and law enforcement [(duty to collect evidence)], sexual assault nurse examiners are not "principally charged with uncovering and prosecuting criminal behavior." *Burke*, 478 P.3d at

---

[22] From our review of *Burke*, *supra*, we glean that the sexual assault victim did not testify in the criminal trial against Burke. *See generally, Burke*, 478 P.3d at 1102-1106. As such, the victim's statements describing the sexual assault were admitted solely through the medical examination report and testimony of the sexual assault nurse examiner. *Id.* at 1105.

- 35 -

1108, *relying on **Ohio v. Clark***, 576 U.S. 237, 249 (2015).  A sexual assault nurse examiner's "specialized evidence-collecting skills and training that supplement their medical training" "does not transform a class of medical professionals into agents of the police[.]" ***Burke***, 478 P.3d at 1109.  As such, the ***Burke*** Court reasoned that the victim's statements to the nurse, as contained in the medical examination report, were "significantly less likely to be testimonial than [if the] statements [had been] given to law enforcement officers[] because medical personnel are not principally charged with uncovering and prosecuting criminal behavior."  ***Id.*** at 1110 (citation and original quotation marks omitted).  The ***Burke*** Court found that

> [m]ost of [the victim's] statements had either two purposes (medical and forensic) or an exclusive medical purpose.  For example, questions about contraception and ejaculation indicated whether and where DNA evidence might be collected, but they were also necessary to determine whether the patient needed medication to treat [STIs] or prevent pregnancy.  Additionally, while the possibility of strangulation and the patient's position during the assault indicated the degree of force (which would bear on what crime the perpetrator could be charged with), that information also revealed where the patient had additional injuries that needed treatment.

***Id.*** at 1111.  Therefore, the ***Burke*** Court held that, with the exception of the victim's statement regarding the description of the assailant (because it did not "provide guidance for medical treatment"), the victim's remaining statements provided in the context of the sexual assault examination had the primary purpose of guiding medical treatment and were "not to provide an out-of-court substitute for trial testimony."  ***Id.*** at 1112.  Consequently, the

"statements were non[-]testimonial and their admission did not violate the [C]onfrontation [C]lause." *Id.*

A similar conclusion was reached by the Supreme Court of Virginia in *Sanders v. Commonwealth*, 711 S.E.2d 213 (Va. 2011), which held that a laboratory report created for medical diagnosis and treatment purposes was non-testimonial and did not implicate the Confrontation Clause. *Id.* at 220. In *Sanders*, Sanders argued that allowing a doctor "to state the conclusion of the unknown laboratory technician as expressed in [a] laboratory report indicating that the [child-victim] had contracted chlamydia violated his right to confront and cross-examine" the laboratory technician who authored the report. *Id.* at 216. Sanders asserted that because the child-victim had been "referred" to the doctor based on allegations of sexual abuse and the doctor knew about the alleged sexual abuse allegations from the victim's mother and the police prior to examining the child-victim, "an objective person could reasonably expect that the test results provided to the doctor would be used in a later criminal prosecution." *Id.* at 217. The Commonwealth responded that the primary purpose of the laboratory testing, and the subsequent reporting of the test results, was for medical treatment and not to prove past events potentially relevant to later criminal prosecution. *Id.*

Ultimately, the Virginia Supreme Court held that the laboratory report, and by extension the doctor's testimony regarding the contents of the report, did not violate Sanders' rights under the Confrontation Clause. *Id.* at 220. In reaching its conclusion, the *Sanders* Court focused on whether, or not, the

laboratory report "was created for medical treatment purposes or forensic investigation purposes."[23] *Id.* at 218. The **Sanders** Court concluded that the doctor's "medical examination of [the child-victim] served a dual purpose: (1) to gather forensic information to investigate and potentially prosecute a defendant for the alleged offenses and (2) to obtain information necessary for medical diagnosis and treatment of the victim." *Id.* at 219. A test for chlamydia, the **Sanders** Court explained, "is a diagnostic test used to determine whether a 'medical condition' exists. The test determines whether the individual has the infection, but that, unlike a DNA test, the test does not provide information identifying the source of the infection."[24] *Id.* As such, the primary purpose of the laboratory report reflecting the results of the STI test, according to the **Sanders** Court, "was for medical treatment purposes as it was created to permit [the doctor] to medically diagnose and treat [the child-victim] for [chlamydia]" and, therefore, was non-testimonial. *Id.* "The fact that the Commonwealth sought [later] to use the laboratory report in a criminal prosecution does not change its non[-]testimonial character. In order to determine if a statement is testimonial, the statement must be evaluated

_____

[23] The "laboratory report in question was never admitted into evidence at trial." **Sanders**, 717 S.E.2d at 218.

[24] A person contracts chlamydia "by having vaginal, anal, or oral sex without a condom with someone who has the infection." https://www.cdc.gov/chlamydia/about/index.html (last visited Dec. 16, 2025). Also, "[a] pregnant woman with chlamydia can give the infection to her baby during childbirth." *Id.*

as to whether the statement was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 219 (original quotation marks omitted), *citing* **Crawford**, 541 U.S. at 52. The **Sanders** Court found that, in objectively evaluating the circumstances under which the laboratory report regarding the child-victim's STI test results was prepared, "there is no basis presented for concluding that the 'primary purpose' of [conducting the analysis or preparing the report] would reasonably have been understood by the laboratory technicians [] to be the development of a statement for use at trial." *Id.* at 219-220.

> The record [] reflects that the independent laboratory performed the testing after receiving the samples from the [medical treatment] clinic. [U]nlike a crime laboratory testing for narcotics or DNA, there are any number of typically non-prosecutorial reasons to test urine and vaginal discharge, such as for infections arising from both consensual sexual and non[-]sexual exposure to pathogens. Thus, under these circumstances, a laboratory technician would not have reason to believe or suspect that the results of his or her testing would be used in a later trial.

*Id.* at 220.

In the case *sub judice*, the physician's assistant who examined the victim testified that, on October 2, 2022, the victim presented herself to the urgent care clinic due to a "concern for a sexual assault" and a need "to be tested and treated." N.T., 10/23/23, at 177; **see also** Commonwealth Exhibit 10 (stating, "[p]atient is a [] female [] who presents complaining of dysuria[ and] rectal pain after being a victim of sexual assault last evening"). The

physician's assistant also stated in the progress notes from the medical examination that the victim "knows who the perpetrator was and [that she] is interested in drug screening [and] STI screening." Commonwealth Exhibit 10. The victim informed the physician's assistant that "[s]he is not interested in involving the police or pressing charges." *Id.*

The physician's assistant testified that, based upon the victim's complaint of "pain with urination and rectal pain," the victim "was given a [urinalysis test], a urine pregnancy test[,] and then also screened for STIs." N.T., 10/23/23, at 177. The physician's assistant stated that, preliminarily, the "urine sample showed the presence of leukocytes and nitrites, which is typical with a bladder infection" so she treated the victim for "what looked like a bladder infection." *Id.* The physician's assistant also stated that she "empirically treated for gonorrhea[, a type of STI,] with an injection of ceftriaxone, which is an antibiotic." *Id.* at 178. The physician's assistant explained that she treated for gonorrhea without knowing the results of the STI tests because "if [a person tests] positive [for gonorrhea], it requires a repeat office visit to get the injection of medicine[.]" *Id.* The victim was also "prescribed some steroid cream that she could apply rectally to help with discomfort there." *Id.* The physician's assistant stated that, as part of the medical evaluation, the victim's urine sample was sent to a laboratory for further analysis. *Id.* at 179. As part of the care and treatment plan, the physician's assistant stated that she would "alter [the] treatment plan depending on [the] STI screening results." Commonwealth Exhibit 10.

The physician's assistant testified that the results of the victim's urinalysis were made a part of the patient's medical records and that the results showed, *inter alia*, that she tested positive for chlamydia and a bladder infection but tested negative for gonorrhea. N.T., 10/23/23, at 179-180; **see also** Commonwealth Exhibits 11 and 12. Based upon the positive test result for chlamydia, the physician's assistant prescribed additional antibiotics to treat the STI. N.T., 10/23/23, at 180.

Under these circumstances, the primary purpose of the STI test and the subsequent laboratory report confirming the results of that test was for medical diagnosis and, if necessary, follow-up treatment. As the physician's assistant stated in her progress notes, the victim already knew the identity of the perpetrator and did not wish to involve law enforcement. Instead, the victim sought treatment for the pain and discomfort she was experiencing and due to a concern that she may have contracted a STI or become pregnant. Unlike DNA tests which may be used to identify a particular person, tests for gonorrhea, chlamydia, and pregnancy are regularly used to diagnose a person's medical condition regardless of whether the medical inquiry is the result of a sexual assault or because the person had unprotected sexual contact with a person whose medical status is unknown. There is no basis in the record upon which to conclude, when viewed objectively, that the laboratory technician understood that these routine tests were being requested for any reason other than for routine medical diagnosis. As such, we conclude that the laboratory report that identified the victim as having

tested positive for chlamydia (Commonwealth Exhibit 11) was non-testimonial and, therefore, did not implicate Appellant's rights under the Confrontation Clause.

When a statement is non-testimonial in nature, as is the laboratory report in the case *sub judice*, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."[25] ***Commonwealth v. Allshouse***, 36 A.3d 163, 174 (Pa. 2012), *quoting* ***Bryant***, 562 U.S. at 359; ***see also Crawford***, 541 U.S. at 68 (stating, "[w]here non[-]testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law").

_____

[25] To the extent that Appellant asserts that the Commonwealth violated Rule 574 by failing to attach proper certification to the laboratory report *in lieu* of expert testimony, we find this argument moot in light of our decision that the laboratory report was non-testimonial and did not implicate the Confrontation Clause. Rule 574 provides a notice and demand mechanism by which the Commonwealth may introduce a forensic laboratory report that constitutes testimonial evidence without calling as a witness at trial the person who authored the report as a means of satisfying the defendant's rights under the Confrontation Clause. Pa.R.Crim.P. 570 *Comment* (stating, "This rule was adopted in 2014 to address the issues raised by the [United States] Supreme Court's decision in ***Melendez-Diaz***[, ***supra***,] that held that the 6th Amendment confrontation right precluded presentation of laboratory reports without a live witness testifying in the trial. In ***Melendez-Diaz***, the [High] Court noted with approval the use of 'notice and demand' procedures as a means of permitting routine laboratory reports to be admitted without the expense of supporting the admission by live expert testimony **while protecting a defendant's confrontation rights**. This rule provides a "notice and demand" procedure for Pennsylvania." (emphasis added; formatting modified)).

Here, the trial court found that the laboratory report was admissible under the business records exception to the rule against hearsay provided that the physician's assistant testified. N.T., 10/23/23, at 19, 25; *see also* Pa.R.E. 803(6).

Hearsay "is an out-of-court statement offered to prove the truth of the matter asserted in the statement." *Commonwealth v. Laich*, 777 A.2d 1057, 1060 (Pa. 2001); *see also* Pa.R.E. 801(c)(1) and (2). A hearsay statement is not admissible unless the proffered statement falls within an established hearsay exception. *Commonwealth v. Fitzpatrick*, 25 A.3d 452, 471 (Pa. 2021); *see also* Pa.R.E. 802.

Pennsylvania Rule of Evidence 803(6), commonly referred to as the "business records exception," states that, regardless of whether the declarant is available as a witness, "[a] record (which includes a memorandum, report, or data compilation in any form) of an act, event[,] or condition" is excludable from the rule against hearsay if:

> (A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). For purpose of the business records exception, a "qualified person" is an individual who is able to "provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness[.]" ***Keystone Dedicated Logistics, LLC v. JGB Enter., Inc.***, 77 A.3d 1, 13 (Pa. Super. 2013) (original quotation marks and citation omitted); *see also **In re Indyk's Est.***, 413 A.2d 371, 373 (Pa. 1979).

It is well-established that "[m]edical records are admissible under the hearsay rules as evidence of facts contained therein but not as evidence of medical opinion or diagnosis." ***Folger Ex Rel. Folger v. Dugan***, 876 A.2d 1049, 1055 (Pa. Super. 2005), *relying on **Commonwealth v. Green***, 380 A.2d 798, 799-801 (Pa. Super. 1977), *appeal denied*, 897 A.2d 458 (Pa. 2006). This Court in ***Commonwealth v. Xiong***, 630 A.2d 446 (Pa. Super. 1993), *appeal denied*, 630 A.2d 446 (Pa. 1994), explained that the justification for allowing medical records to be admitted as an exception to the rule against hearsay was because "the manner in which hospital records are maintained carries safeguards at least as substantial as the guarantees of reliability of the records of business establishments and []these recorded facts are routinely used to make decisions upon which the health and life of the patient depend." ***Xiong***, 630 A.2d at 453 (citation and original quotation marks omitted).

"In general, when the record reveals what is or is not present in the patient, or that a test occurred, the record reflects facts." *Folger*, 876 A.2d at 1056. "On the other hand, when the record reflects what the presence or absence of something means, the record more likely reflects a medical diagnosis or opinion." *Id.* (footnote omitted).

In *Folger*, this Court held that a medical report reflecting a positive result for the presence of herpes in a patient's spinal fluid was a "fact" because the test results revealed what was, or was not, present in the patient. *Id.* at 1056-1057. Similarly, this Court in *Commonwealth v. Nieves*, 582 A.2d 341 (Pa. Super. 1990), *appeal denied*, 600 A.2d 952 (Pa. 1991), held that a medical report showing positive test results for gonorrhea was properly admitted into evidence under the business records exception to the hearsay rule. *Nieves*, 582 A.2d at 344.

Here, the physician's assistant testified that, as part of her medical evaluation of the victim, she ordered several tests, including a urinalysis, a urine pregnancy test, and a STI test for, *inter alia*, chlamydia. N.T., 10/23/23, at 178-179. The physician's assistant explained that the laboratory report reflecting the STI test results had the victim's name and the date the test was performed marked at the top of the report. *Id.* at 179; *see also* Commonwealth Exhibit 11. The physician's assistant stated that the report indicated that the victim tested positive for chlamydia. N.T., 10/23/23, at 179; *see also* Commonwealth Exhibit 11 (indicating that the bacteria causing chlamydia (chlamydia trachomitis) was detected in the analysis of the victim's

urine sample). Upon receiving the laboratory report, and the results contained therein, the physician's assistant testified that she prescribed antibiotics to treat the victim's chlamydia infection. N.T., 10/23/23, at 180.

Based upon a review of the record, we discern no error or abuse of discretion in the trial court's decision to admit the laboratory report reflecting the victim's positive test rest for chlamydia (Commonwealth Exhibit 11) into evidence. The report contained only a medical fact, namely that the bacteria which caused chlamydia was present in the victim's urine. **Folger**, 876 A.2d at 1056; **see also Nieves**, 582 A.2d at 344. Moreover, the physician's assistant provided sufficient information regarding preparation of the laboratory report to justify the presumption of trustworthiness, and Appellant provided no evidence to overcome this presumption. As such, the laboratory report was properly admitted into evidence under the business records exception to the rule against hearsay.[26] **See** Pa.R.E. 803(6).

_____

[26] To the extent that Appellant asserts that the trial court erred in permitting the sexual assault nurse examiner and Appellant's wife from referring to the laboratory report results which showed that the victim tested positive for chlamydia on the grounds that the test results constituted hearsay, we find this argument to be of no avail. **See** Appellant's Brief at 28-29 (stating, "any use of the [STI test] results was hearsay"). As discussed *supra*, the laboratory report showing the positive test result was properly admitted under the business records exception to the rule against hearsay. Moreover, Appellant's motion *in limine* preserved his challenge to the admission of the laboratory report without further objection. The motion *in limine*, however, did not object to testimony that was potentially being offered by the Commonwealth's witnesses. Therefore, in order to preserve a particular objection to the testimony of a witness, such as the sexual assault nurse examiner or Appellant's wife, Appellant needed to lodge a specific objection on the record

In his final issue, Appellant claims that the trial court erred when it permitted the Commonwealth to impeach its own witness, namely Appellant's wife. Appellant's Brief at 31-32.

Pennsylvania Rule of Evidence 607 states as follows:

### Rule 607. Who May Impeach a Witness, Evidence to Impeach a Witness

**(a) Who May Impeach a Witness.** Any party, including the party that called the witness, may attack the witness's credibility.

**(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa.R.E. 607.

On cross-examination, Appellant's counsel asked Appellant's wife if she told law enforcement, during an interview after the incident, that she would not lie for her husband, to which Appellant's wife responded "Yes. I told them [(referring to the law enforcement officers)] that I would not lie for him. It would put my kids in jeopardy." N.T., 10/24/23, at 99. On re-direct, the Commonwealth asked Appellant's wife, "Just to clarify, you wouldn't lie for your husband?" *Id.* at 100. Appellant's wife responded, "No. I would not."

_____

at the time of the testimony. A review of the notes of testimony demonstrates that when the sexual assault nurse examiner and Appellant's wife testified about the victim testing positive for chlamydia, Appellant failed to lodge a specific objection to the testimony. *See Commonwealth v. McGriff*, 160 A.3d 863, 866-868 (Pa. Super. 2017) (finding that, although McGriff lodged an anticipatory objection in his motion *in limine*, he failed to make a specific objection at the time the testimony was offered at trial), *appeal denied*, 176 A.3d 853 (Pa. 2017).

***Id.*** Over objection by Appellant's counsel, the Commonwealth then played an audio recording in which Appellant's wife was heard stating that she "would do whatever it takes" to help her husband. ***Id.*** at 103. Appellant's wife, when asked if she heard the statement she made in the recording, stated "Yes, but I do not mean that." ***Id.***

As the trial court noted, and we concur, Appellant's counsel questioned Appellant's wife "regarding [her willingness to lie] for her husband[] and[, therefore[,] opened the door for [] further questions regarding her [willingness to undertake such conduct]." Trial Court Opinion, 1/21/25, at 8. The Commonwealth did not move to impeach its witness until after she stated that she would not lie for Appellant. Once Appellant's counsel elicited this testimony through his cross-examination, and Appellant's wife offered her response, Rule 607 permitted the Commonwealth to impeach its own witness. Therefore, we discern no error or abuse of discretion in the trial court's decision to allow the Commonwealth to conduct redirect examination to impeach Appellant's wife during her trial testimony.

For the reasons set forth herein, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 1/15/2026